CHARLES ROBINSON & another, administrators, *vs.* GEORGE W. SIMMONS & others.

Suffolk.   November 17, 18, 1887. — February 29, 1888.

Present: MORTON, C. J., FIELD, C. ALLEN, HOLMES, & KNOWLTON, JJ.

*Partnership — Surviving Partners — Distribution of Profits — Equity Practice.*

The representatives of a deceased partner, whose capital is used by the surviving partner in the business, may generally, if there is no agreement, elect to demand either interest on such capital or the profits earned by its use.

A surviving partner, who in good faith continues to use in the business his deceased partner's capital with the consent of a majority of his heirs, is entitled to compensation for his skill and services out of the profits earned by it; and the latter's representatives will take only such profits as then remain.

The surviving partners in a manufacturing firm paid the debts of a deceased partner out of the firm assets, and continued to use in the business his share of the capital, which consisted largely of goods in process of manufacture, with the consent of the majority of his heirs but against the protest of the minority, and realized large profits.  Subsequently, the majority agreed that their shares of the capital might remain in the business at a certain rate of interest, and the minority were paid a sum on account of their shares.  *Held*, on a bill in equity for an accounting, that the debts so paid should go in reduction of the deceased partner's capital, and that the balance due the minority after the payment on account should be paid with interest at the rate agreed on by the majority.

On a bill in equity by administrators against the surviving partners and all the heirs of the intestate, the object of which is to ascertain a sum due from the partners to a minority of the heirs, this court will order payment of such sum to be made directly to the latter.

BILL IN EQUITY, filed March 25, 1884, by two of the administrators of the estate of George W. Simmons against the surviving partners of the firm of George W. Simmons and Son, one of whom was the remaining administrator, for an account and for the recovery of an amount due the estate.   On January 29, 1887, the bill was amended so as to make the surviving children

of said Simmons, and the representatives of his widow and of a deceased child, parties defendant. The case was referred to a master, whose report, so far as material, is as follows:

On February 1, 1869, George W. Simmons, who had been engaged for many years in the business of manufacturing and selling clothing at " Oak Hall," so called, numbered 32 and 34 North Street, in Boston, formed a copartnership with his son, George W. Simmons, junior, and Philip A. Spofford. By the terms of the partnership, George W. Simmons was to receive eighty-two per cent of the profits, George W. Simmons, junior, ten per cent, and Philip A. Spofford eight per cent of the same; and this arrangement continued until the death of George W. Simmons, except that his share of the profits was from time to time reduced, and the share of the profits of George W. Simmons, junior, was correspondingly increased.

George W. Simmons died, intestate, on December 14, 1882, leaving a widow and seven children. The balance of capital to his credit on that day was $66,480.10; to the credit of the defendant Simmons, $9,584.29; and to the defendant Spofford, $5,203.29; making a total capital of $81,267.48. The widow was entitled to one third of her husband's interest, and the children, including the defendant Simmons, were entitled to the remaining two thirds.

Immediately after the death of George W. Simmons an account of stock was taken by the firm, and on December 20, 1882, the defendants Simmons and Spofford formed a new copartnership under the firm name of G. W. Simmons & Co., by the terms of which the former was to receive ninety-two per cent of the profits and the latter eight per cent of the same. The new firm paid the liabilities, and began business at the same place with the stock and assets of the old firm, and without any new capital, and have continued to do a profitable business. No consent was given by Virginia A. Beals, Edith W. Beals, or Frances A. Henshaw, three married daughters of George W. Simmons, or by the representative of the last named daughter and her children, to such use and appropriation of the stock and assets of the old firm, and they always objected thereto; but the same was concurred in by the widow and the other three children, besides the defendant Simmons. The heirs were not

able to agree upon the appointment of administrators upon the estate, and the Probate Court, on February 5, 1883, appointed two administrators, of whom the defendant Simmons was one. From this decree an appeal was taken, and in November, 1883, the plaintiffs and the defendant Simmons were appointed administrators by the Supreme Judicial Court.

On September 1, 1883, the widow and the three children last named executed the following writing: " The undersigned desire, and do hereby give their consent, that their respective shares in the interest of G. W. Simmons (deceased) in the firm of G. W. Simmons and Son, Oak Hall, shall remain in the business as at present conducted by G. W. Simmons and P. Augustus Spofford under the name of G. W. Simmons & Co. for a period of three years; simple interest to be paid reckoned at rate of seven (7) per cent yearly, — payable quarterly or monthly if desired."

On August 27, 1883, the surviving partners paid to two of the heirs, and to the representative of the third, who had not consented to the use by the firm of their interests in the estate, the sum of $20,000, taking the following receipt therefor: " Boston, August 25, 1883. Received of George W. Simmons and T. Augustus Spofford, surviving partners of the firm of George W. Simmons and Son, the sum of ($20,000) twenty thousand dollars, the same to be accounted for in settlement of the estate of George W. Simmons, deceased, as received on account of our respective shares in his interest in the firm of George W. Simmons and Son, and which to that extent shall be discharge of the liability of the surviving partners to us as heirs of said deceased, directly or through administrators. This receipt is executed without prejudice to our further claims on said surviving partners, whether through administrators or otherwise, and is strictly limited to the business and assets of Oak Hall." Before and after this payment the defendants Simmons and Spofford expressed a willingness to pay to the parties to this receipt the whole amount to which they were entitled, but without offering any specific sum or rendering any account whereby it could be ascertained. The parties could never agree as to the methods of ascertaining, or as to the persons by whom such amount should be ascertained, but said defendants were willing to have the books examined by an expert who should be

suggested by the parties seeking the examination. No person to act as such expert was suggested, though requested by said defendants. Offers were made to have the amount determined by arbitration, but no names for arbitrators were ever suggested or agreed upon; and said defendants were active in urging and procuring the bringing of the present suit, as the only means of fixing the amount of their liability.

Among the individual debts of George W. Simmons, deceased, was a subscription of $5,000 to the stock of a new corporation called the Craighead and Kintz Manufacturing Company, and a note amounting with interest to $13,433.33, secured by mortgage of real estate at Ballardvale. The subscription of $5,000 was paid on May 4, 1883, by the defendant Simmons, out of the assets of the firm, under a written agreement, dated April 27, 1883, and signed by the widow and the surviving children, and the representative of the deceased daughter and her children, which provided that the subscription might be "paid out of any personal assets of the estate of said George W. Simmons, deceased, the widow and each of the heirs to bear their proper proportion of the payment. They also agree that said sum of five thousand dollars so to be paid shall be considered as so much personal estate taken out of the estate subject to administration, and that they will protect each other if any contingency shall arise requiring the widow and heirs of said George W. to make restitution to the administrators when appointed. The purpose of this agreement is to enable said corporation to get in all its capital, and to provide for the five thousand dollars subscribed by said George W., payment of which could not now be enforced, but which we are willing to pay according to our several interests and liability (if any exists), and so to take so much of the personal assets out of the administration." The mortgage note was paid in the same manner, on December 7, 1883, under an agreement, which was dated June 21, 1883, and signed by the same persons, and was as follows: "The undersigned hereby request Geo. W. Simmons to pay — out of any available assets of the estate of Geo. W. Simmons, deceased — the mortgage on the Ballardvale real estate, the amount of the mortgage to be allowed him in his settlement with the administrators of the estate when appointed."

Among the assets of the estate in the possession of the defendant Simmons were fifteen St. Paul and Sioux City bonds of one thousand dollars each. These bonds were sold by brokers in New York, employed for that purpose by the defendant Simmons when the market reached prices satisfactory to him, and the proceeds, with interest and coupons, amounting to $18,807.64, were paid over to the defendant Simmons by the brokers, in one payment by check, in February, 1885. This check was delivered by him to the plaintiff Robinson, who gave a receipt therefor, dated February 11, 1885, and held the proceeds as a part of the estate in his hands. The defendant Simmons, when he began to sell these bonds, intended to apply the proceeds to the Craighead and Kintz subscription and the Ballardvale mortgage, and ordered them to be sold for that purpose, but at the time of the payment of the subscription, on May 4, 1883, none of the bonds had been sold; and at the time of the payment of the mortgage, on December 7, 1883, three bonds only had been sold, realizing $3,436.25, in the hands of the brokers. The other debts of the estate have been paid, the payments being largely made by the defendant Simmons out of the assets of the new firm. The amount so paid before the appointment of administrators was $11,792.45, and that paid subsequent to such appointment was $25,041.18; the balance of $14,607.85 over and above the mortgage being made up principally of interest on mortgage notes of George W. Simmons, deceased. The defendant Simmons collected the rents of the real estate, and paid the taxes and other expenses thereon. The net income received by him from the real estate up to February 1, 1885, was $15,448.95, which sum was paid into the general fund of the new firm, and was credited on their books to the estate of George W. Simmons, to which account also were charged all the disbursements and other expenses on account of the real estate.

The master found that at the death of George W. Simmons a considerable portion of the stock then on hand was partially manufactured clothing, and that the only way to realize the fair or substantial value of such goods was to deal with it as the defendants did, by completing the garments, adding new materials, and disposing of them at retail; that if the unfinished clothing had been sold, either in large or small lots, in the condition in

which it was on December 14, 1882, a small percentage only of
its cost could have been realized ; that the manner in which the
defendants dealt with the whole stock was necessary in order to
obtain its full value ; that if any allowance was to be made to
the defendants for their skill and services in realizing the full
value of the whole stock, such allowance would be equal to
twenty per cent of the profits, to be deducted from the share of
George W. Simmons, deceased ; and that, if profits were to be
allowed to the estate of George W. Simmons and to the defend-
ants in proportion to the amounts of capital standing to their
several credits, and without regard to the share of profits which
the parties were severally receiving at his death, the value of the
services of the defendants in earning them was forty per cent
of such profits ; and reserved for the decision of the court the
rule for the measure of the liability of the surviving partners,
upon the facts stated in his report.

Hearing before *Devens*, J., who reserved the case for the con-
sideration of the full court.

*R. M. Morse, Jr.*, for the plaintiffs.

I. In ascertaining the share of the deceased, the surviving
partners must not only bring into account the assets of the firm
which actually existed at the time of his death, but also what-
ever has been obtained by the employment of these assets up to
the time of the closing of the account; for so long as profits are
made by the employment of the capital of the deceased partner,
so long must such profits be accounted for by the surviving part-
ners.    2 Lindl. Part. 1046.    *Crawshay* v. *Collins*, 15 Ves. 218.
*Yates* v. *Finn*, 13 Ch. D. 839.    *Washburn* v. *Goodman*, 17 Pick. ·
519.    *Townend* v. *Townend*, 1 Giff. 201.    *Goodburn* v. *Stevens*,
1 Md. Ch. 420 ; *S. C.* 5 Gill, 1.    *Brown's Appeal*, 89 Penn. St.
139.    *Forrester* v. *Oliver*, 1 Bradw. 259.    *Skidmore* v. *Collier*,
8 Hun, 50.    *Cook* v. *Collingridge*, Jacob, 607.

The defendants Simmons and Spofford contend that, con-
ceding the rule above stated to be correct, they are not to be
charged with the $66,480.10, standing to the credit of George
W. Simmons at his death, but certain payments are to be de-
ducted therefrom.    The entire amount of · these payments is
not to be applied to the reduction of the capital, because they
were not made to the administrators, or at their request, but

should be treated as debits to the estate in the account which said defendants have opened with it. At the most, they cannot have any greater allowance than for the difference between the amounts so paid and the amounts received by them for rents.

II. The surviving partners are not entitled to compensation for their services in carrying on the business. 1. Because they were bound to deal with the stock in such manner as in the exercise of reasonable diligence would produce the most money. 2. Because, if under any circumstances surviving partners might be allowed compensation, they are not entitled to it where they have wilfully, against the objection of parties interested in the estate, undertaken to pervert the trust in their hands, and to use the firm assets for their private benefit. 3. Because the defendant Simmons, who would receive $\frac{92}{100}$ of the compensation, is an administrator, as well as surviving partner.

The general rule is, that surviving partners are not entitled to compensation. *Dunlap* v. *Watson*, 124 Mass. 305. *Beatty* v. *Wray*, 19 Penn. St. 516. *Brown* v. *McFarland*, 41 Penn. St. 129. *Washburn* v. *Goodman*, 17 Pick. 519. *Brown's Appeal*, 89 Penn. St. 139. It has been allowed only in exceptional cases: where the surviving partner, with the consent of the representative of the deceased partner, carried on the business of completing important contracts with the government during the war for the manufacture of cannon under patents, *Schenkl* v. *Dana*, 118 Mass. 236; where the surviving partner carried on the business under a claim of right to buy the business by the terms of the partnership agreement, *Yates* v. *Finn*, 13 Ch. D. 839; where at the time of the death of the deceased partner the firm was insolvent, and was rendered solvent by the credit and connections of the surviving partners, *Wedderburn* v. *Wedderburn*, 2 Keen, 722; *S. C.* 4 Myl. & Cr. 41, and 22 Beav. 84.

But there is a clear distinction between all of these cases and the case at bar. No peculiar skill or service was required in making up a lot of unfinished clothing, and in selling out the stock at retail. It was the obvious and proper thing to do. It must fairly have been within the contemplation of the partners, as the best method for winding up the business whenever a dissolution should come. The fact that the defendant Simmons is administrator, and as such entitled to compensation, is a suffi-

cient reason why no compensation should be allowed him as surviving partner. To allow compensation to him in the latter capacity would make it for his interest to prolong the settlement of the estate, and to use it for his private benefit, instead of securing a diligent conversion of the assets "into an available and distributable form." *Heathcote* v. *Hulme*, 1 Jac. & W. 122.

III. The only issue in this case is the amount due from the defendants Simmons and Spofford to the administrators. The transaction of August 25, 1883, by which the former paid $20,000 to the married daughters and the representative of one of them, and that of September 1, 1883, by which the widow and remaining children agreed that their shares should remain in the business at seven per cent interest, are not material to the issue, and the questions arising thereon cannot be determined by the decree in this case.

*W. G. Russell & J. O. Teele*, for the surviving partners and other defendants.

*W. K. Blodgett, Jr.*, for the surviving married daughters.

MORTON, C. J. George W. Simmons died intestate, on December 14, 1882, leaving a widow and seven children. He was a member of the firm of George W. Simmons and Son, in which his son, George W. Simmons, Jr., and Philip A. Spofford were his partners. Immediately upon his death the two surviving partners formed a new firm under the name of G. W. Simmons & Co., and continued the business at the same place, using the capital and stock in trade of the old firm. Owing to a disagreement between the heirs, administration was not taken out until November, 1883, when the plaintiffs and the defendant Simmons were appointed administrators. In the mean time, the defendant Simmons had paid debts of his father to a large amount out of the property in the hands of the surviving partners; the widow and three of the children had, on September 1, 1883, made an agreement that their respective shares in the interest of the intestate "in the firm of G. W. Simmons and Son, Oak Hall, shall remain in the business as at present conducted by" the surviving partners, at interest at the rate of seven per cent per year, and on August 25, 1883, the defendant Simmons had paid to the other three children twenty thousand dollars, to be accounted for in settlement of the estate of the intestate on

account of their respective shares in his interest in the firm of G. W. Simmons and Son. The surviving partners continued the business, using the capital of the intestate, with the consent and approval of the widow and the three children first above named ; the other three children, being the married daughters, never gave any such consent, but objected thereto.

The suit was originally brought by two of the administrators against the surviving partners, but by amendment all the children of the intestate, and the representatives of the widow and of a deceased child, were made parties defendant. The only controversy is between the three married daughters and the surviving partners, the ultimate object of the suit being to recover the share to which they are respectively entitled of the profits of the business since the death of the intestate.

There is nothing in the case to show any want of fairness or good faith in the conduct of the surviving partners, but the master has found that the interest of the intestate was of such a character that the only way to realize its fair or substantial value was to deal with it as the defendants did, and " that the manner in which the defendants dealt with the full stock was necessary in order to obtain its full value." The master found that upon the death of the intestate the capital standing to his credit was $66,480.10, that to the credit of the surviving partners $14,787.38, making the whole capital $81,267.48. This is an outline of the principal facts in the case, and upon them the master reserved for the decision of the court the rule for the measure of the liability of the surviving partners.

If the accounts could have been settled at the death of the intestate, his representatives would have been entitled to receive the above named amount of capital standing to his credit. As we have seen, this was impracticable, and the surviving partners continued the business, using the capital of the intestate with the consent of those who represented five sevenths of his interest, and under the objections of the three dissenting heirs who represented two sevenths.

As a general rule, where a surviving partner continues to use the capital of a deceased partner in the business, the representatives of the latter, in the absence of any agreement to the contrary, have the election to demand either interest on the

capital used or the profits earned by its use, the latter being accretions to the fund owned by them. There is, however, no inflexible rule governing all cases, but each case depends upon its own circumstances and equities.

The plaintiffs contend that in this case the rule should be that the profits accruing after the death of the intestate should be divided according to the amount of capital which each partner or person interested had in the business, and that no compensation or allowance should be made to the surviving partners for their services and skill in conducting the business. We do not think that this rule is supported by the authorities, or is just as applied to this case. It finds some support in *Crawshay* v. *Collins*, 15 Ves. 218; *S. C.* 1 Jac. & W. 267, and 2 Russ. 325. This case, which was before Lord Eldon at intervals for eighteen years, was a suit by an assignee of a bankrupt against the continuing partners of the firm of which he was a member; the assignee was held to be entitled to three eighths of the profits accruing after the bankruptcy, that being the proportion of the bankrupt's capital and profits in the business, but a just allowance was made for the services of the continuing partners. The case has been much commented on in later cases, and it has never been regarded as establishing an inflexible rule applicable to all cases. Indeed, in this case Lord Eldon says, " The rule which is to be applied must be deduced, in almost every case, from the particular circumstances of that very case "; and he fully recognized the justice of making allowance for the skill and services of the surviving partners. The later English authorities regard this as the effect of Lord Eldon's decisions in the various stages of *Crawshay* v. *Collins*. *Brown* v. *De Tastet*, Jacob, 284. *Cook* v. *Collingridge*, Jacob, 607. *Wedderburn* v. *Wedderburn*, 2 Keen, 722; *S. C.* 4 Myl. & Cr. 41, and 22 Beav. 84. *Willett* v. *Blanford*, 1 Hare, 253. *Yates* v. *Finn*, 13 Ch. D. 839.

In most of these cases the rule applied was, that the profits should be divided according to the capital, after making allowance for profits earned by the personal activity, attention to business, skill, and services of the surviving partners, though in *Wedderburn* v. *Wedderburn* the representatives of the deceased partner were held to be entitled to interest at the rate of five per cent on their capital, instead of a share of the profits.

We think a just rule to be deduced from the authorities is, that, where there are no circumstances which render its application inequitable, the profits should be divided according to the capital, after deducting such share of them as is attributable to the skill and services of the surviving partner. When his good faith and fairness are not impeached, the most that the representatives of the deceased partner can justly demand is, that he should account to them for their capital, and, in addition, for whatever it has earned. This involves the necessity of inquiring how much of the profits is attributable to the services and skill of the surviving partners, and how much to the capital invested in the business. The latter portion of the profits shows what the capital has earned, and should rightfully be divided among the owners of the capital in proportion to their shares of the capital. It is clear, that, in applying this rule, any withdrawal or subtraction by the representatives of the deceased partner of any part of their capital would diminish *pro tanto* the proportion of the profits to which they are entitled. *Willett* v. *Blanford, ubi supra.*

In the case at bar, as we have said, there is nothing to impeach the good faith or fairness of the surviving partners. The defendant Simmons, who is the principal surviving partner, upon the death of his father, was placed in a very difficult and embarrassing position. A large amount of property belonging to his father was invested in the business. Owing to a quarrel among the heirs, no administrators were appointed for nearly a year. There was no one with any power to close up the business, either by a sale of the interest of the intestate, or otherwise; a majority of the heirs in number and amount desired him to continue the business. It is difficult to see how he could have done better than he did; he appears to have acted with due regard to the interests of all concerned, and no rule of a punitive character could justly be applied in the case. We think the rule of division of profits we have stated above will work out substantial justice to all parties, for that period of time when the surviving partners employed the whole or the principal part of the capital of the intestate as the basis of their business, that is, up to August 27, 1883.

In applying the rule, some questions arise as to the amount of

the capital belonging to the plaintiffs which was from time to time embarked in the business and thus earning profits. Among the individual debts of the intestate was a subscription of five thousand dollars to the stock of a corporation recently established in Ballardvale, and a note of thirteen thousand dollars secured by a mortgage of real estate at Ballardvale. It was for some reason deemed necessary that these should be promptly paid, and the widow and all the heirs agreed in writing that the defendant Simmons should pay them out of any personal assets of the intestate. Accordingly, on May 4, 1883, he paid the subscription out of the assets of the new firm, and charged his father's account with the amount. The facts found by the master show that this was the only means he had of paying this debt. At one time he intended to apply to this debt the proceeds of the fifteen St. Paul and Sioux City bonds mentioned in the report; but the proceeds of these bonds were not in fact received in time to pay this debt. He could only carry out the wishes of all the interested parties by paying it, as he did, out of the property of the estate in the hands of the new firm. Such payment had the effect in law which it had in fact, of reducing the capital of the intestate in use in the new firm. We think that the same rule should apply to the other debts in good faith paid by the defendant Simmons and charged to his father's account; and that, after applying to such payments the amounts received by him for rents and used in making such payments, the balance should go in reduction of the capital of the intestate in use in the new firm.

After the death of the intestate the surviving partners were desirous of paying as soon as could be the amount of the capital which he left in the business. As we have seen, delay occurred in appointing administrators, and on August 27, 1883, the defendants paid to the three dissenting heirs the sum of twenty thousand dollars, which, in the words of the receipt signed by them, was "to be accounted for in settlement of the estate of George W. Simmons, deceased, as received on account of our respective shares in his interest in the firm of George W. Simmons and Son, and which to that extent shall be discharge of the liability of the surviving partners to us as heirs of said deceased, directly or through administrators." There can be no doubt

that this was, in intention and effect, a withdrawal by the three dissenting heirs of twenty thousand dollars of their share of the capital. The only question is as to the mode in which this payment should be applied. It seems to us that the just mode is to ascertain what was the interest of the dissenting heirs at the time the payment was made, both in capital and accumulated profits which are attributable to capital, and from this amount to deduct the payment. The balance will represent the amount of their capital which continues in the firm, and for the use of which they are entitled to compensation. In ascertaining the amount of profits in this computation there should be deducted from the gross profits that share which is attributable to the services and skill of the surviving partners, which we understand the master finds to be forty per cent, and the balance should be divided according to the respective shares of the parties in the capital.

It also appears that, on September 1, 1883, the surviving partners made an arrangement with the widow and three of the children, by which they agreed that their respective shares in the interest of the deceased in the firm of G. W. Simmons and Son should remain in the business of the new firm at an interest of seven per cent per annum. The effect of this was to change the amount of their shares so far as they were concerned, from capital to a debt of the new firm, and to transfer the same amount of the capital to the credit of the surviving partners. The widow and three children who signed it, and the defendant Simmons, were entitled to five sevenths of the estate of the intestate, and the result of this arrangement therefore was that the surviving partners became the owners of the whole of the capital, except the small balance due to the dissenting heirs.

As we have before intimated, the principles we have discussed should be applied in ascertaining how much was due to the dissenting children on August 27, 1883. But, as we have seen, at that time a material change occurred in the circumstances and the relations of the parties which justifies and requires the application of a different rule for the future.

The surviving partners then, evidently as parts of the same scheme or purpose of relieving themselves of the responsibility of the care of the property of the intestate which was forced

upon them, virtually paid to the widow and four of the heirs the amount of their shares of the estate of the intestate, and also paid to the three dissenting heirs twenty thousand dollars on account of their shares. This is more than the amount of their original shares, with interest; but upon applying the rule we have adopted, it is less than the amount they were entitled to at the time of the payment. The parties differed as to the basis upon which the accounts should be settled. The facts show that the surviving partners were willing to pay all that the heirs were entitled to; that they offered to have the books and accounts examined by any impartial expert, to be named by the dissenting heirs; that they offered to have the amount determined by arbitration, and that they were, when the administrators were appointed, active in urging and procuring the bringing of this suit, as the only means of fixing the amount of their liability.

It also appears that the business of the new firm was prosperous, and its profits very large; the surviving partners were anxious to pay what they justly owed the heirs, and it is not an unfair inference that the payment of this amount by the firm would not in any measure cripple its resources or injure its business. It is difficult to believe that the retention or withdrawal of this comparatively small amount would in any considerable degree affect the volume of business, or the amount of the profits. Under these circumstances, it would be inequitable to apply the rule of the division of the future profits according to the nominal capital. It would be unjust to the surviving partners, as it would compel them to work for the benefit of a compulsory partner against their wishes, and to bear the most of the burden of a protracted litigation, for which the dissenting heirs are at least equally to blame. It would give the latter more than they are fairly entitled to as the earnings or income of the debt which is due them, and swell unjustly the amount they receive from their father's estate.

We are therefore of opinion, that, unless the parties can agree, the case should be recommitted to the master to ascertain the balance due to the three dissenting heirs after the payment of August 27, 1883, upon the principles we have stated, and that thereafter the surviving partners should pay interest upon such

balance at the rate of seven per cent per year. We adopt this rate of interest, because the defendants at the time of the payment in August fixed this as the worth to them of the capital retained.

. A question remains as to the payment by the defendant Simmons of the Ballardvale mortgage above referred to. This payment was not made until after August, 1883, and cannot therefore be applied in reduction of the capital of the intestate before that day in determining the amount due to the dissenting heirs on that day. But it was made by virtue of an agreement with all the heirs. The dissenting heirs were responsible for two sevenths of it, and we think that, when paid, two sevenths of the amount should be charged to them in diminution of the amount then found to be due them.

The plaintiffs contend that this suit is to be treated as simply a suit between the administrators and the surviving partners, and that the latter should be decreed to pay to the former the whole amount of the accrued profits, without any regard to their payments to and agreements with the heirs, leaving the sum so paid to be distributed in the Probate Court. We do not think this is necessary or just. All the persons interested are parties to this suit. None have any controversy with the surviving partners, except the three dissenting heirs, and the object of the suit is to determine the amount to which they are entitled. This being determined, and paid, either directly or through the administrators, the object of the suit is accomplished, and the rights of all parties are protected. The amount, if paid to the administrators, would be for the sole benefit of these three heirs; no one else would have any claim upon it, and it is to be assumed that the Probate Court would order its distribution and payment to them. There would be no conflict between the two courts, and no mandatory order to the Probate Court. The decree would operate personally upon all the parties, and by its force would enable the dissenting children to receive the amount they are entitled to.

There is no necessity of going through the form of ordering the surviving partners to pay a large sum to the administrators which must be immediately repaid to them.

*Case recommitted.*