MARY E. MAGULLION & another, executors, *vs.* JOHN E. F. MAGEE.

Suffolk.    March 7, 1922. — May 18, 1922.

Present: RUGG, C.J., BRALEY, DE COURCY, CROSBY, & CARROLL, JJ.

*Equity Pleading and Practice,* Master: recommittal of report. *Partnership,* Accounting by surviving partner.

An interlocutory decree in a suit in equity denying a motion to recommit a report to a master must be affirmed upon appeal unless the record shows an abuse of judicial discretion.

In a suit in equity by the executors of the will of one of two partners engaged in the wholesale and retail liquor business in Boston against the surviving partner for an accounting, the plaintiffs contended that the defendant, who continued the business for a time after the death of the plaintiffs' testator, had failed to perform his duty in the winding up of the partnership estate and the disposing of the assets and that he was negligent and was chargeable for loss and depreciation in the assets and loss of good will caused by such negligence. It appeared from facts found by a master, who heard the case and whose report contained no report of the evidence, and from inferences reasonably to be drawn therefrom, that the business of the partnership had been conducted upon two adjoining parcels of real estate, each of the partners owning one of the parcels, that to sell the business as a going concern was the only way to gain adequate return for the good will, that such sale could not be made without assurances of continued tenancy from the owners of both parcels of real estate and that the plaintiffs, who as trustees under the will of their testator had succeeded to that one of the two parcels which had been owned by their testator, would not agree to a lease of the premises on terms which would induce a purchaser to buy the stock, fixtures and good will and thus enable the defendant to realize as much therefor as otherwise might have been obtained, that whatever loss might have been occasioned by the ultimate failure of the defendant to obtain anything for the good will, as such, of the business, if it had any, when eventually it was sold, was due to the conduct of the plaintiffs and not to any conduct of the defendant; and the master refused to sustain the contention of the plaintiffs. *Held,* that the defendant was not chargeable as the plaintiffs contended.

A partner, who winds up the business of a partnership dissolved by the death of one of the partners, as a general rule and in the absence of a special agreement is not entitled to be paid for his services in so doing.

In the suit above described, the master found that the plaintiffs requested the defendant not to hasten the sale of the business until they had an opportunity to consider what was for their interest; that the defendant gave to the business all his time except "reasonable vacations;" that the "difficulties of management were intensified by the conduct of the plaintiffs . . . in interfering or attempting to interfere with" the defendant's "conduct of the business, and the hampering of his plans to sell the business as a going concern, by their obstructive tactics in regard to leasing their property and . . . two bills in equity which they brought against" the defendant. The master also stated that he found no evidence of special skill in the management by the defendant resulting in increased profit or other benefit to the estate, and that there was no evidence of any agreement by the plaintiffs to pay the defendant for his services. *Held*, that no circumstances were shown warranting an exception to the general rule above stated, and that the defendant was not entitled to be paid for his services.

The surviving partner, in the circumstances above described, was authorized to obtain advice as to his duties and to employ and pay counsel out of the assets if necessary to collect and preserve them for the benefit of himself and the estate, but the expense of services of counsel employed by him to assert or to protect his private interests adversely to the plaintiffs should be borne by him individually.

In the suit above described, allowances made to the defendant for counsel fees were held, on the findings of the master, to have been made for services of counsel rendered to the defendant as surviving partner and to have been reasonable in amount.

In the suit above described, it appeared that, before the death of the plaintiffs' testator, the partners had improved the adjoining parcels of real estate by making structural changes so that they might be used substantially as one parcel. The master found that it was impossible to separate the accountancy entries which were for alterations as distinguished from those which were for fixtures and other items except in a few instances, and he declined to charge the defendant with the cost of the alterations in the property owned by him in the circumstances. *Held*, that

(1) It was a rational inference from the above and other findings that the partners intended that the firm should bear the expense of the changes made in their respective buildings because of the benefits to accrue to their business;

(2) It could not be said as a matter of law in the absence of a report of the evidence that the master's findings plainly were wrong.

BILL IN EQUITY, filed in the Superior Court with a writ of summons and attachment dated February 14, 1917, by the executors of the will of John R. Magullion, late of Boston, against John E. F. Magee, a partner with the plaintiffs' testator from 1894 until his death on March 12, 1914, in the wholesale and retail liquor business under the firm name and style, Magullion and Company.

In the Superior Court, the suit was referred to a master. Material findings of fact by the master are described in the opinion. The plaintiffs filed forty-three objections to the master's report and exceptions based thereon. Those referred to in the opinion were as follows:

"2. For that the master finds . . . 'that the cost of these changes [1912] which were paid for by the firm was, including fixtures, $15,355.22,' and later states that 'it is impossible to separate the entries which are for alterations as distinguished from fixtures except in a few instances.' The complainants say that it is the duty of the master to make this separation; that the evidence of . . . a public accountant . . . shows that the sum of $14,865.20 was spent for alterations in 1912, and that a further sum of $2,311.47 was spent for fixtures, making the total expenses of 1912 alterations and fixtures $17,176.67.

"3. For that the master, . . . speaking of certain accountants' reports, says 'the evidence does not disclose that either partner ever objected to any of these statements as not being correct.' This is a statement that there is no evidence either one way or the other, and the master has erred in stating facts where there is no evidence."

"6. For that . . . the master says 'The rocks upon which all such attempts were wrecked, was the question as to what the Magullion trustees would do in respect to leasing their property.' This finding is immaterial and irrelevant in this action. The actions of the trustees of the Magullion estate can have no bearing on the issues in this suit brought by the executors against the respondent. The executors and trustees of the Magullion estate were the same persons but the duties of their separate offices were distinct. Their dealings with the real estate which they owned was not connected with their duties as executors, furthermore, as trustees they were under no duty to lease to the defendant, but the defendant was under the duty of selling the business as a going concern for the best price possible, even if the tenancy of the purchaser was to be only that of a tenant at will."

"13. For that . . . the master finds 'Magee's failure to make active endeavors to sell' (up to this time April, 1915) 'was justified because of the requests made by the plaintiffs that he should

continue the business pending their determination as to whether they would purchase his interest or sell to him,' whereas in his previous findings it appears that any such requests were prior to September of 1914, and the finding that they continued up to April 30 is therefore inconsistent. Furthermore it is not in accordance with the evidence.

"14. For that the master states . . . that the executors brought 'absolutely unjustifiable suits.' This is a ruling of law based on facts which are not set forth in the report, and it is for the court to say on facts reported by the master whether said actions were unjustifiable and justified Magee in 'not actively seeking to sell.'

"15. For that the master states . . . that the executors made 'unreasonable demands in respect to the leasing of their property' which is a ruling of law made by the master without setting forth the facts on which the conclusion is made. In their requests for findings of fact, the plaintiffs requested a report of these facts. Furthermore the plaintiffs did not own the property as executors but as trustees, and as trustees were under the legal duty of leasing their property for its full value, and were under no duty of any kind to the defendant and could not therefore be unreasonable."

"18. For that the master says . . . 'I find that whatever loss may have been occasioned by the ultimate failure of Magee to obtain anything for the good will of the business, if it' had any, when it was eventually sold, was due to the conduct of the plaintiffs and not to any design by Magee.' There is no finding anywhere in the report that the business was ever sold or offered for sale as a business where the good will value might be obtained, and said finding is not warranted by the other findings of the master.

"19. For that the master . . . says 'I find that without leases or some assurance of tenancy there was no good will.' There is no finding anywhere that the plaintiffs would give no assurance of a tenancy, on which to base said conclusion. The defendant remained as a tenant at will until August 1, 1915, and the business could have been sold as a going concern with a tenancy at will such as he had. Later the report shows that the defendant procured a lease from the trustees on their terms, which could have been procured by any purchaser at any time."

"22. For that the master says . . . 'I find that he [the defendant] exercised good business judgment in his conduct of the business, and sale of the assets, under very difficult conditions,' and there are no findings of fact showing what the difficult conditions were upon which he bases his conclusion."

"24. For that . . . the master finds that if the defendant is entitled as a matter of law to compensation, he is entitled to compensation at the rate of $75 per week to May 1, 1915, whereas in paragraph 25 he sets forth the master's findings in the former suit that the defendant if entitled to compensation as a matter of law, should be paid at the rate of $60 per week, and these findings of the former master were admitted by him as *res judicata* of similar issues in the present action.

"25. For that the master . . . in reaching his conclusion that $5000 was reasonable compensation for services of counsel has included the services in the first action to establish a partnership, whereas said action was a personal action against the respondent, individually, and not as surviving partner, and therefore he was not entitled to compensation from the estate. The master was requested [by the plaintiffs] to separate his allowance for services in this action so that the matter . . . may be passed on by the court, but that he has refused to do so.

"26. For that in . . . the master has found that the value of the counsel services from July 20, 1915, to date is $2500 including those rendered in the present suit. That under the other findings of fact in this report, . . . the defendant is not entitled as a matter of law to compensation for counsel services in the present action; that the master though requested by the plaintiffs . . . to separate his allowance for services rendered in the present suit, has refused to do so."

"28. For that the master has neglected to find . . . that the plaintiffs are entitled to interest from the date of the writ, which finding was contained in his draft report."

The suit was heard by *Wait*, J., upon the master's report, a motion by the plaintiffs to recommit the report to the master and the plaintiffs' exceptions to the report; and by his order the motion to recommit the report was denied and a final decree was entered, overruling all of the exceptions to the report except the twenty-eighth, which was sustained, confirming the re-

port as thus modified, and directing the defendant to pay to the plaintiffs the sum of $6,780.41 with interest at six per cent from March 5, 1917.

*C. H. Cronin*, for the plaintiffs.

*Lee M. Friedman*, (*W. E. Collins* with him,) for the defendant.

CROSBY, J. This is a bill in equity for an accounting brought by the executors of the will of John R. Magullion against the defendant, as surviving partner of the firm of J. R. Magullion and Company. The testator and the defendant formed the partnership in 1894 and it continued until the death of Magullion on March 12, 1914. At that time, the firm was conducting a retail liquor business and bar room at the corner of Tremont and Dover streets in Boston, and a wholesale liquor business next door on Tremont Street. The adjoining premises on Dover Street, numbered 6, were also used by the firm, and a grocery store with a bottled goods liquor department was carried on at No. 575 Columbus Avenue. The interests of the partners in the firm were equal. The property where the business was conducted in the two stores on Tremont Street was owned by Magullion, to whom the firm as a tenant at will paid rent.

The will of the testator was allowed by the Probate Court on April 2, 1914, and on that date the plaintiffs were appointed executors and trustees thereunder. The case was referred to a master (together with a suit brought by the plaintiffs as trustees against the defendant), who filed a report, and later, the plaintiffs moved that the report be recommitted to the master; the motion was denied and the plaintiffs appealed. The plaintiffs filed a large number of exceptions to the report. The judge of the Superior Court sustained the twenty-eighth, and a final decree was entered overruling all the other exceptions and confirming the report as so modified.

The decree further provides that the defendant pay the items set forth as liabilities in the schedule shown in paragraph C of the master's report and also pay the plaintiffs the sum of $6,780.41 with interest thereon from March 5, 1917, at the rate of six per cent per annum.

It is the contention of the plaintiffs that the defendant failed to perform his duty as surviving partner and thereby caused a large loss to them; that he is not entitled to compensation for

his services or to charge the estate for counsel fees; that he is bound to account for excessive rent charged and collected by him for the premises standing in his name and numbered 6 Dover Street, and should account for firm moneys expended in the alteration of the building at 6 Dover Street. The evidence not having been reported, the master's findings must stand unless clearly erroneous.

Although counsel for the plaintiffs strenuously contend that their motion to recommit the report should have been allowed, it is well settled that that question rests in the sound discretion of the judge; and his decision will not be set aside unless it appears that the denial of the motion amounts to an abuse of judicial discretion, which we cannot find in this case. *Reno* v. *Cotter,* 239 Mass. 581, and cases cited. It follows that the order denying the motion is affirmed.

The master found as follows: The defendant as surviving partner took possession of all the assets of the firm upon the death of Magullion. He was anxious to close out the business but made no definite move in that direction, however, because, to enable him to get the best price, it was necessary that the business should be sold as a going concern with liquor licenses in force and with leases of the premises which assured a location to the purchaser. Until the allowance of the will and the appointment of trustees thereunder there was no one capable of fixing rent or other terms of the lease of the stores. When the will was allowed and the plaintiffs were appointed executors and trustees, application was immediately made for renewal of the licenses and those interested in the estate asked the defendant "not to hasten the disposition of the business as they wished an opportunity to consider what was best for their interests, including the possiblilty of their purchasing the business themselves. They requested that Magee run the business along for six months, but this he refused to do and finally agreed upon a month." The licenses were renewed on May 1, 1914. "During June and the early part of July, more or less indefinite talk was indulged in regarding the purchase by the estate but nothing came of it. On July 15 there was a general conference at which the parties and their counsel were present, . . . and further talk was indulged in with regard to the possibility of either the estate

buying Magee out or of his buying the estate out." On July 22, 1914, the plaintiffs brought a bill in equity against the defendant alleging that he and they had entered into an agreement to carry on the business; that Magee had been guilty of misconduct and praying for a dissolution of the partnership and the appointment of a receiver. After a hearing and a finding by the court that there never had been any agreement for a partnership, a final decree was entered dismissing the bill on November 6, 1914.

It is apparent that during all this time there were serious disagreements between the parties respecting the business. In July, 1914, the matter was brought to the attention of the licensing board which endeavored to bring about a settlement and adjustment of the affairs of the parties and suggested that arbitrators be appointed to determine the value of the business with and without leases of the Magullion properties, but no agreement was reached. The plaintiffs asked the defendant to make an offer for their interest in the business which should contemplate a lease of the whole of the Magullion property, although only the first floor and basement had been required for the business; and the defendant offered $50,000 for their interest and agreed to pay $5,000 rent if certain repairs and alterations were made, which offer was refused.

The master's report further states: that on November 10, 1914, a second suit in equity was brought by the plaintiffs against the defendant which was referred to a master. His report was confirmed and a final decree dismissing the bill was entered on June 9, 1915. Some of his findings are referred to in the master's report in the case at bar. No further litigation between the parties occurred until the present suit was begun in March, 1917. The liquor business was carried on by the defendant under the licenses which were renewed on May 1, 1914, until May 1, 1915. After the latter date the licenses for the Tremont Street stores were not renewed. The master found that "This action constituted the Tremont [Street] and Dover Street licenses what are called pocket licenses. . . . At this time pocket licenses were currently worth about $12,000."

The master also found as follows: "Up to this time . . . Magee had made no efforts to sell the business as a going concern to any third party . . . he had had no offers for its purchase . . .

the conditions were such that it would have been useless for him
to have attempted to sell with any likelihood of obtaining a price
at all commensurate with the intrinsic value of the business,
without reasonable leases of the two properties. . . . Magee's
failure to make active endeavors to sell was justified because
of the requests made by the plaintiffs that he should continue
the business pending their determination as to whether they
would purchase his interest or sell to him . . . the conditions
which justified Magee in not actively seeking to sell were largely,
if not wholly created by the unreasonable conduct of the executors,
especially Flynn, in bringing what appear to have been abso-
lutely unjustifiable suits which I have mentioned, making un-
reasonable demands in respect to the leasing of their property,
and leasing it to Macdonald for the purpose of ousting Magee
from the firm's principal place of business . . . these things were
done by the executors primarily for the purpose of forcing Magee
to accept the executors as partners in the business or else of forc-
ing him to purchase their interest and take a lease of their prop-
erty at such a figure as would enable them to receive in income
an amount equal to what they would receive if they continued
as partners . . . whatever loss may have been occasioned by
the ultimate failure of Magee to obtain anything for the good
will, as such, of the business, if it had any, when it was event--
ually sold, was due to the conduct of the plaintiffs and not to
any design of Magee . . . without leases or some assurance of
tenancy, there was no good will in this business which is capable
of capitalization." The master further found, that after the
second suit in equity above referred to was disposed of, the de--
fendant advertised for sale by auction the assets of the firm and
on July 20, 1915, the sale was held and the stock and fixtures
of the Tremont and Dover Street stores were sold; that there
were no bids for the two "pocket licenses;" that some whiskey
in bond was not sold; that he then placed the "pocket licenses"
in the hands of brokers and advertised them in Boston news--
papers; that the highest offer he received was $11,000; that he
refused to sell for that sum as he was of opinion that they were
worth $12,000. The master states that Magee's opinion of the
value of the licenses was correct.

It was also found that after the Tremont and Dover street.

stores were closed the defendant continued to run the Columbus Avenue store until April, 1917, when he advertised it for sale and sold it with the rights under the license for $16,500, which was a fair price for the property; and that the defendant was not negligent with respect to its disposition; that in April, 1916, the trustees and executors agreed that the defendant might buy the pocket licenses covering the Tremont and Dover street locations at a sum not less than $11,000 each, with the understanding that he was to be charged any excess in value above $11,000 as the same might be found on the final accounting between them; that the defendant accepted this offer and paid the plaintiffs $11,000 therefor, and they were renewed in the name of the defendant by the Licensing Board of the City of Boston; that $11,000 was a fair price at the time the defendant purchased them.

It also appears from the master's report that prior to the hearing before him the defendant had disposed of all the tangible assets of the firm and had paid over to the plaintiffs as executors a portion of their share of the proceeds received; that he exercised good business judgment in his conduct of the business and the sale of the assets.

Upon the foregoing and other findings we are unable to say that the defendant, as surviving partner, failed to perform his duty in winding up the estate and disposing of the assets or that any depreciation thereof was due to his neglect. It is plain that unless a lease of the premises from the plaintiffs as trustees could be obtained by a purchaser on terms satisfactory to him the value of the business and firm assets would be much less than if sold with an assured location in which the business could be continued. While it is found that as a going concern the business was worth at the time of the testator's death from $120,000 to $125,000, it is obvious that in order to realize that value it was necessary that the business should be sold with an assurance that the purchaser would be able for a reasonable rent to occupy the premises. It is a fair inference from the findings, that the plaintiffs as trustees in control of the real estate would not agree to a lease of the premises on terms which would induce a purchaser to buy the stock, fixtures and good will and thus enable the defendant to realize as much therefor as otherwise might have been obtained.

Under these circumstances the defendant cannot be charged with the great loss which was incurred because the business was not sold as a going concern. We cannot say that the finding "that whatever loss may have been occasioned by the ultimate failure of Magee to obtain anything for the good will, as such, of the business, if it had any, when it was eventually sold, was due to the conduct of the plaintiffs and not to any design of Magee . . . that without leases or some assurance of tenancy, there was no good will in this business which is capable of capitalization," was not justified.

Many of the exceptions taken by the plaintiffs have been waived; not all those that are relied on need be considered in detail.

It follows from what has been said that exceptions numbered 3, 6, 13, 14, 15, 18, 19 and 22 must be overruled.

Exception 24 is to the finding of the master that if the defendant is entitled as matter of law to compensation for his services as surviving partner, he is so entitled at the rate of $75 per week. The general rule is that where a partnership is dissolved by death of one of the partners the partner who winds up the business is not entitled to pay in the discharge of that duty, in the absence of special agreement to be paid for such services. "But if, with the assent of the administrator of the deceased partner, he employs extra labor to finish existing contracts; if he enters upon new contracts, employing the machinery, patents and property of the firm therein; then, to the extent of his personal services devoted to such extra work, he is entitled to compensation." *Schenkl* v. *Dana,* 118 Mass. 236, 239. *Dunlap* v. *Watson,* 124 Mass. 305. *Ruggles* v. *Buckley,* 175 Fed. Rep. 57. Notwithstanding the general rule, circumstances may exist which entitle a surviving partner to compensation for services in liquidating the assets of the firm. It was said by Holmes, J., in *Thayer* v. *Badger,* 171 Mass. 279, 280: "It is true, no doubt, that there is a disinclination to allow pay to a surviving partner for winding up; *Dunlap* v. *Watson,* 124 Mass. 305; but the tendency is to deal with such questions on their particular circumstances, rather than by absolute rules. *Turnbull* v. *Pomeroy,* 140 Mass. 117, 118. *Robinson* v. *Simmons,* 146 Mass. 167." *Wiggins* v. *Brand,* 202 Mass. 141, 145.

In the light of the decisions above referred to, the question is whether there are any special circumstances which make the present case an exception to the general rule.  The master found that the plaintiffs requested the defendant not to hasten the sale of the business until they had an opportunity to consider what was for their interest; that the defendant gave to it all his time except "reasonable vacations;" that the "difficulties of management were intensified by the conduct of the plaintiffs . . . in interfering or attempting to interfere with Magee's conduct of the business, and the hampering of his plans to sell the business as a going concern, by their obstructive tactics in regard to leasing their property and the two bills in equity which they brought against Magee."  He states, "I find no evidence of special skill in the management by Magee resulting in increased profits or other benefit to the estate," nor is there evidence of any agreement by the plaintiffs to pay him for his services.  We are of opinion that upon these and the other findings of the master no circumstances are shown which entitle the defendant to be paid for his services.  The circumstances that the sale of the assets was delayed because it was believed more could be realized by a sale of the business as a going concern, that the plaintiffs as trustees did not agree to lease the property except on terms satisfactory to themselves, and brought suits against the defendant, do not entitle the defendant to compensation.  The plaintiffs as trustees, acting in good faith, were bound to manage the property for the best interests of their beneficiaries, and so acting were not required to lease the stores except on terms which they believed to be fair and reasonable.  Upon all the facts as disclosed by the master's report, we are of opinion that the rule laid down in *Schenkl* v. *Dana, supra,* governs the case at bar and that the charge of the defendant of $5,250 for services should be disallowed and one half of that amount credited to the plaintiffs.

Exceptions 25 and 26 relate to charges of the defendant of $5,000 and $2,500 for services of counsel.  The surviving partner was authorized to obtain advice as to his duties and to employ and pay counsel out of the assets, if necessary to collect and preserve them for the benefit of himself and the estate.  The right to charge for such services is analogous to that of executors, administrators and trustees.  *Forward* v. *Forward,* 6 Allen, 494,

497. *Dudley* v. *Sanborn,* 159 Mass. 185, 189. *Hampden Trust Co.* v. *Leary,* 186 Mass. 577, 579. *Loring* v. *Wise,* 226 Mass. 231. He was not empowered to employ counsel to assert or protect his private interests adversely to the plaintiffs; such legal services should be borne by him individually. *Blake* v. *Pegram,* 109 Mass. 541. *Urann* v. *Coates,* 117 Mass. 41, 44.

The suits in equity were brought by the plaintiffs against the defendant individually. These and other matters which required him to have counsel were for the protection of his personal interests and for which the plaintiffs received no benefit or advantage, while other legal services are found to have been rendered to him as surviving partner. On this question the master's report recites: "I find that the situation was such that his personal interests were more or less closely connected with his interests as a surviving partner, and that he had occasion to obtain advice in respect to his personal interests. He employed the same counsel and he paid for that service independently of that rendered him as surviving partner. Evidence was adduced before me showing in detail the service performed by Magee's counsel in respect to his interests as surviving partner, and I have given it careful consideration and find that the sum of $5,000 paid by Magee in June, 1915, for services to June 19 of that year was a reasonable amount. I find that the fair value of the services rendered by counsel to Magee as surviving partner since that date including those rendered in the present suit to date, to be $2,500. In my account I have treated the additional $2,500 as a firm liability."

Upon this finding it appears that the charges for counsel fees were for services rendered to the defendant as surviving partner, and as they are found to have been reasonable in amount, they must stand.

The failure of the master to find that the defendant is chargeable with the amount expended by the firm in reconstructing the building at No. 6 Dover Street cannot be said to be plainly wrong. While the title to this property stood in the name of the defendant, it is found that in the spring of 1912 the partners agreed that more room was needed for the conduct of their business and "a plan was finally agreed upon by which structural changes in both properties should be made which would result

in the ground and basement floors of the two properties becoming substantially one. The end sought was to utilize the ground floor of the Magee building as an addition to the bar space of No. 498 Tremont Street, so that the bar would have entrances on both Tremont and Dover streets." The total expense of these changes including fixtures was $15,355.22 and was paid for by the firm. The master found that it was impossible to separate the entries which are for alterations as distinguished from fixtures and other items, except in a few instances; he declined to charge the defendant with the cost of the alterations in the Dover Street property, under the circumstances. It was a rational inference from the above and other findings that the partners intended that the firm should bear the expense of the changes made in their respective buildings because of the benefits to accrue to their business. When the alterations were completed, it is found that the partners fixed the rental of Magee's property at $3,000, the same as that of Magullion's, and that sum was paid thereafter. We are unable to say that in the absence of a report of the evidence these findings were plainly wrong.

Many of the exceptions have been waived; we have considered all now relied on. It would serve no useful purpose to refer to them in detail; we are satisfied that none can be sustained. As the final decree includes a charge for $5,250, made by the defendant for services, which should have been disallowed, the final decree is to be modified accordingly; with costs to the plaintiffs.

*So ordered.*