SARAH E. RUTAN, executrix, *vs.* CHARLES A. COOLIDGE.

Suffolk.   October 17, 18, 1921. — June 27, 1922.

Present: RUGG, C.J., CROSBY, CARROLL, & JENNEY, JJ.

*Partnership,* Dissolution, Accounting.   *Architect.   Good Will.*

Two architects conducted business as partners with offices in Boston and in Chicago, each partner receiving half of the profits of the business, the first partner having charge of making calculations of construction, writing specifications, superintending construction and office details in Boston, having little to do with the Chicago office, doing no designing and having personal relations with but a few of the firm's clients, and the second partner doing all the designing and all the artistic and creative work of the firm and conducting substantially all dealings with clients.   Following two years of incapacity of the first partner during which time he had received his full share of the profits, the firm was dissolved and within thirty days the first partner died. At the time of the dissolution, the majority of the firm's clients looked chiefly to the second partner and a substantial number of important clients had stipulated for his personal services.   At the time of the dissolution, there were on hand in the office jobs in all stages, from work actually in operation to work only vaguely contemplated, where only tentative plans had been discussed with the architects.   A suit in equity by the executrix of the first partner against the second partner for an accounting was reserved for determination by this court upon the pleadings, reports by a master without a report of the evidence, exceptions to the reports by the plaintiff and a motion by the defendant that the report be confirmed.   *Held,* that

(1) Whether the professional firm had a good will of value in so far as it related to the possibility of future business was a question of fact;

(2) The right of the surviving partner to follow his profession could not be affected by the death of his partner or the voluntary dissolution of the partnership;

(3) The defendant had a right to seek the patronage of the clients of the old firm and to enter upon a competing business; and these facts were important in deciding whether the general good will of the firm was of any substantial value;

(4) A finding by the master, that the good will of the firm in so far as it related to the possibility of future business was of no substantial value, was warranted;

(5) The evidence not being reported, a finding by the master that an adequate price was paid by the defendant for assets of the partnership, sold at auction before the suit was begun, which included that portion of the good will which consisted in the possibility of obtaining a right to continue the jobs as to which the firm had been consulted and which were in various stages of incompleteness, could not be disturbed;

(6) The facts warranted a finding that the liquidating partner was entitled

to special compensation for services rendered, relating to work of the partnership finished by him as liquidating partner;

(7) Rulings and findings of the master as to the defendant's accountability for work in the office of the firm at the date of dissolution, holding him to account for the profits realized from that part of the work completed by him as liquidating partner, and taking into account, as a part of the good will of the firm in the sale made of the assets and good will, of that part of the work about which the firm had been consulted but where there were no contracts between the owner and contractor, were sufficiently favorable to the plaintiff;

(8) A finding that there was no bad faith on the part of the defendant did not appear to have been wrong;

(9) The master having found that the method of adjusting accounts with a new firm formed by the defendant relating to business of the old firm in the circumstances was "as correct and fair a method as could be used," his refusal to charge the defendant with interest on a certain deferred payment was not open to question; [1]

(10) The master's accounting was correct and, as it appeared that, after the filing of the report, the balance shown by the report to be due to the plaintiff had been satisfied, the bill was dismissed.

BILL IN EQUITY, filed in the Supreme Judicial Court on June 1, 1916, against the liquidating partner of the firm of Shepley, Rutan and Coolidge for an accounting.

The suit was referred to a master and, after the filing of his report, was recommitted to him for certain further findings.

Material findings of the master, other than those described in the opinion, were in substance as follows:

From the time of the formation of the original firm of Shepley, Rutan and Coolidge, the designing and all of the artistic and creative work were done either by Shepley or Coolidge. They were the members of the firm who principally dealt with the clients, and Coolidge travelled extensively about the country, employing his large acquaintance in increasing the business of the firm. He went to Chicago, Cincinnati, and St. Louis, and also to California, in the interests of the firm. As a part of the partnership business he established and conducted an office in Chicago under the name of Shepley, Rutan and Coolidge, and he lived there for eight years. During that period he was responsible for all of the work done from that office and built up a valuable practice in that city. In the Boston office the work of dealing with clients was conducted by Shepley and Coolidge or by Shepley alone during Coolidge's absence. Rutan had little to do with the Chicago office. In the Boston office he made or had charge of

making calculations for construction, the writing of specifications, and superintendence of construction, and had general charge of the bookkeeping and the office detail. He did no designing and had personal relations with few of the clients.

The business of the new partnership, after the death of Shepley in 1903, was done in substantially the same manner as theretofore, so far as the work of the individual partners was concerned. The designing and all artistic and creative work was done by Coolidge and substantially all dealings with clients were conducted by him. Rutan took substantially the same part in the work as he had taken before Shepley's death. At the time of the dissolution of the firm on December 1, 1914, the majority of the clients of the firm looked chiefly to Coolidge, and a substantial number of important clients had stipulated for his personal services.

As time went on and Rutan grew older, he became less and less active in the work of the firm. By 1908 the change had become marked. In April of 1912 he had a stroke of apoplexy, and another in August of that year, and after that he came no more to the office and took no part in the business. He continued, however, to receive his full share of fifty per cent of the profits of the business.

In the spring of 1914, Coolidge reached the conclusion that the existing situation in the partnership must be brought to a close. By that time Shattuck, an employee in the Boston office, had become active and important in the work of the firm in Boston, and in like manner Hodgdon in the Chicago office. Each of these men had been given an interest in the profits and was held out as a partner. Both Shattuck and Hodgdon became pressing for an interest in the firm commensurate with the work done and responsibility taken by them in connection with the firm business. This pressure played a large part in Coolidge's determination to alter the existing situation, inasmuch as any increase in the share of Shattuck or Hodgdon would obviously increase the burden under which Coolidge was laboring in paying one half of the residue of the profits to a disabled member of the firm.

The situation in the Chicago office was the more pressing; in part because Hodgdon was then in sole charge at Chicago, and in part because important work was then in prospect at the

Chicago office for the University of Nebraska, and Coolidge believed that Mr. Hodgdon would control this work. Coolidge at that time believed that the Chicago business, which was in fact a distinct business from the one in Boston, constituted a separate partnership, and as early as 1913 discussed with Hodgdon the possibility of terminating the existing partnership and entering into a new partnership with Hodgdon. Early in January, 1914, Coolidge had an interview with Strickland, a draftsman in the Boston office, who was Rutan's son-in-law and had a general power of attorney from Rutan. Although there is some uncertainty as to the exact purport of that conversation, it is clear that Coolidge expressed his desire to terminate Rutan's interest in the Chicago business and labored under the impression that such informal intimation was all that was necessary to terminate the partnership in this respect. Laboring under this impression, Coolidge informed Hodgdon that he had terminated Rutan's interest in the Chicago firm and arranged informally for a new partnership with Hodgdon. Hodgdon thereupon proceeded to remove the name "Charles H. Rutan" from the corner of the letterhead used at the Chicago office, but retained thereon the name of Shepley, Rutan and Coolidge as the firm name. Thereafter he divided the profits and remitted to Boston upon the theory that Rutan was no longer a partner in the Chicago business and that only he and Coolidge shared the profits. It does not appear that Strickland or any one else representing Rutan was further informed of this arrangement, and no arrangement was made in Chicago to account for Rutan's interest as of the date when Hodgdon began dividing the profits between himself and Coolidge; and there was no closing of the Chicago books, or any interruption in the continuous entries in the books and accounts. Coolidge, however, did not contend in this case that the informal arrangement with Hodgdon had the legal effect to change Rutan's interest or that the present accounting should be affected thereby.

In April, 1914, Coolidge decided to terminate Rutan's interest in what he considered the Boston partnership, informally notified Strickland to this effect, and stated that he was preparing papers preparatory to a settlement. In the summer of 1914 Coolidge suggested the purchase of Rutan's interest for $15,000, but the

negotiations at that time came to nothing. No adjustment having been reached, and the prospects of the business having become further complicated by the outbreak of the 'world war, Coolidge consulted counsel and was advised that there was substantial doubt whether the informal notices to Strickland had sufficed to dissolve the partnership. After certain correspondence, conducted by his counsel, formal written notice of dissolution was prepared and duly served upon Rutan, terminating the partnership on December 1, 1914. On December 17, 1914, Rutan died, and his executrix, the plaintiff, was appointed January 20, 1915.

After the dissolution of the partnership, Coolidge formed a partnership with Hodgdon in Chicago under the name, Coolidge and Hodgdon, and a partnership with Shattuck in Boston under the name, Coolidge and Shattuck. Each of these partnerships participated in completing certain unfinished business of the old firm and accounted with the defendant as liquidating partner of the old firm.

The conclusions of the master on the accounting were that the plaintiff's share of profits of the firm was $97,230.50; that she had been paid on account of principal and interest since dissolution the sum of $78,856.94; and that, at the time of the filing of the first report of the master, January 28, 1920, there was due to the plaintiff $18,373.56.

In his supplemental report the master found that this balance had been paid by the defendant to the plaintiff with interest to the date of payment.

Other material findings of the master are described in the opinion.

The plaintiff filed exceptions to the first report of the master which, so far as material, were as follows:

"1. Because the master finds and rules that 'With the possible exception of a few special contracts there was no unfinished business in the sense of legal obligations of the firm not yet fully performed.'

"2. Because the master rules 'that in the absence of special contract the only asset of the partnership December 1, 1914, resulting from any uncompleted job at whatever stage, consisted of two items, — (1) the fair value of services rendered to date and not paid for; (2) the contingent value of the job as one of

many items to be taken into account in determining the value of the good-will of the partnership.'

"3. Because the master finds and rules that the good-will of the partnership consists in part of 'the possibility of holding or obtaining the right to continue the various jobs as to which, in various stages, the firm has already been consulted.'

"4. Because the master finds that 'the general good-will of the firm of Shepley, Rutan and Coolidge was of no substantial value.'

"5. Because the master rules 'that Coolidge was entitled to compete in his own name for the carrying on of all work in the office except as specifically stated, including jobs where contracts had been let and the work was in progress, and was under no duty to carry on this work as liquidating partner.'

"6. Because the master finds as follows: 'If the account were to be stated as of December 1, 1914, unaffected by subsequent events, I should find the value of the good-will of Shepley, Rutan and Coolidge of every nature, including both offices and including the contingent value already referred to of the sketches and plans in connection with current work, to have been the sum of $15,000.'

"7. Because the master finds and rules that 'Upon the facts hereinbefore reported I find and rule that no special contract between the University of Nebraska and Shepley, Rutan and Coolidge had been completed prior to the dissolution of the firm.'

"8. Because the master finds that Coolidge never formed any plan or entertained any intention to dissolve the partnership and so conduct its affairs in liquidation as to prejudice the just claims of Rutan and his representatives.

"9. Because the master finds as follows: 'Feeling acutely the burden of the situation, but without any advice of counsel, Coolidge had offered $15,000 for Rutan's share in the partnership. This amount was of course inadequate as a matter of law, but was offered by Coolidge in good faith and in the belief that the offer was morally fair in view of the length of time during which Rutan had received full profits without taking any part in the work of the firm. Coolidge did not believe that the good-will of the firm was worth anything, and did not at any time refuse or intend to refuse the full legal rights of Rutan and his

representatives as he understood them or as they might ulti-mately be determined.'

"10. Because the master finds that the consideration paid by the defendant for the assets of the firm sold at the auction sale was adequate.

"11. Because the master finds that the paying back to Shepley, Rutan and Coolidge in liquidation the amount of the liquidating firm's funds used by Coolidge and Shattuck up to March 9, 1917, after deducting therefrom amounts of money alleged to have been expended by Coolidge and Shattuck from their funds on work of the firm in liquidation was 'under all the circumstances as correct and fair a method as could be used.'

"12. Because the master finds that 'Coolidge was wrong in thinking that it was his duty as liquidating partner to complete and account for as unfinished business of the firm all work on which as between owner and contractor the contracts had been let on December 1, 1914.'

"13. Because the master rules that Coolidge in completing the work which he by his own admission expressly assumed as liqui-dating partner was entitled to 'reasonable compensation for his personal services as architect.'

"14. Because the master rules and finds as follows: 'Coolidge is not accountable for profits on so-called unfinished work not expressly assumed by him as stated above. On this work I find that the relationship entered into with clients was entered into by the new partnerships. It is true that during the transition period the situation was for a time ambiguous, that there were only a few instances of express employment of the new firms, and that in most instances the correspondence and plans merely drifted into the names of the new partnerships. It is clear, how-ever, that the professional relationship of architect and client became ultimately a relationship between the new partnerships and the clients with the hearty approval of the clients; and I am not satisfied that during the ambiguous transition period the relationship which was finally entered into was anticipated or prevented by the assumption of any other relationship on Coolidge's part, or that during this transition period Coolidge entered into, assumed or occupied professional relationships with former clients in his capacity of representative of the old firm in

liquidation, except with respect to those jobs in which contracts had been let December 1, 1914, and in which I have found that Coolidge assumed obligations as liquidating partner.'

"15. Because the master finds and rules as follows: 'As to the work on which Coolidge assumed responsibility as liquidating partner, he in fact held and finished these jobs and has always been ready and willing to account for their full value. He did nothing to preserve or increase the good-will of the old firm in liquidation in connection with the work of completing these jobs, and he refused to sell them to Mrs. Rutan [the plaintiff] as a part of the good-will or otherwise. If, by so doing, he diminished the value of the good-will which he offered for sale, this was more than counterbalanced by the greater value which he contributed to the firm in liquidation by crediting the firm account with the whole of the profit on those jobs without condition and by giving up his right to compete therefor in his own name; in fact, by so doing he contributed more than the entire value of this portion of the good-will. As to work on which contracts had not been let before December 1, 1914, and which were not assumed by Coolidge in his capacity of liquidating partner, while Coolidge repudiated Mrs. Rutan's claim that the unconditional right to complete these jobs was an asset of the firm, he never refused to give credit for their value if they had a substantial value as part of the good-will of the firm. They had in fact some value as good-will even against his right to compete in his own name, and it is true that Coolidge did nothing to preserve this element of good-will against his own competition. If it was his duty to do any more than he did to preserve this element of good-will, it remains true, as has already been stated with respect to good-will generally, that no suggestion was ever made that any rights of this character connected with the business were salable to an outsider, and that no suggestion was ever made on behalf of Mrs. Rutan that she would be willing to consider a purchase except upon conditions which, if my rulings are correct, would involve the surrender by Coolidge of certain of his individual rights; and Coolidge's reasonable anticipation was that he would acquire the business upon making such payment as was proper in connection with the good-will of the old firm. The payment at the auction sale was adequate to include the good-

will incident to all business of this class. Coolidge does not and never did dispute his liability to pay the full value. There is no doubt that he is properly chargeable with its full value.'

"16. Because the master finds that Mr. Coolidge 'acted throughout in entire good faith.'"

"19. Because the master rules as follows: 'I assume that inherent in the qualities of the somewhat anomalous position of a liquidating partner are his rights as an individual to compete in his own name for future business, including work on hand of the character under consideration in this case, and that his obligations as liquidating partner do not supersede or nullify these individual rights. I assume that a liquidating partner is under no obligation to dispose of any part of his individual rights on terms which do not commend themselves to him, even if by so disposing of these individual rights he could secure a sale of the firm assets on terms more favorable than could otherwise be obtained.'

"20. Because the master rules and finds as follows: 'If my rulings as to what the partnership assets consisted of are correct, I find that Coolidge did everything possible to obtain the full value of these assets unless it was his duty to do something to preserve the good-will for purposes of sale against his own competition. If my rulings are correct, he had the right to compete, and his only omission was in confessedly taking no step in his capacity as liquidating partner to protect the good-will against his own individual competition. What steps he could have taken are not very obvious, and in view of the fact that no sale to an outside purchaser was ever suggested or contemplated, and no sale to Mrs. Rutan was ever suggested by her except upon terms which, if my rulings are correct, she had no right to impose, I find that upon all the facts and circumstances of this case herein reported Coolidge acted with reasonable diligence to realize, and did realize, the best obtainable value for the firm assets as I have defined them. If it were necessary for the purpose of stating the account, I should rule that Coolidge's omission to take steps to preserve the good-will under the particular circumstances of this case constituted no breach of duty on his part. In any event, I find that no one was damaged by any such omission.'

"21. Because the master finds that 'Hodgdon's hostility to the

Rutan claims did not of itself render it unfair or unreasonable that he be employed.'

"22. Because the master finds as follows: 'Whether Coolidge should be charged with profits on jobs not assumed by him as liquidating partner, I find that in so far as the profits on any such jobs may be thought to result from, and to be the proceeds of, good-will appropriated by him, these commissions or profits were mainly payment for his own professional services and represented only to a small fractional degree the proceeds of such good-will.'

"23. Because the master finds that 'In the case of Shepley, Rutan and Coolidge, from fifty to fifty-nine per cent of the commissions was required for expenses, but the commissions on a job were in no sense the proceeds of the profitable commercial employment of capital or assets. In spite of the fact, therefore, that on jobs not assumed by Mr. Coolidge as liquidating partner the moneys for which he was accountable as liquidating partner may to some extent have been used (although duly repaid) towards expenses of his new business, and that the commissions on these jobs did to some small extent represent good-will of the firm of Shepley, Rutan and Coolidge, I rule for the purposes of stating the account that the facts last referred to do not require me to charge Coolidge with the profits on jobs not assumed by him as liquidating partner.'"

The plaintiff also filed exceptions to the supplementary report of the master which, so far as material, were as follows:

"1. Because he rules as a matter of law that Coolidge is entitled to compensation for personal services rendered in connection with each of the jobs enumerated in the supplementary report.

"2. Because he finds and rules that Coolidge, as liquidating and surviving partner, is entitled to an amount of compensation for winding up the unfinished partnership business measured not by his own services rendered to the partnership in dissolution, but rather by the services of the partnership in dissolution rendered to clients.

"3. Because he rules and finds that Coolidge, the liquidating and surviving partner, is entitled to compensation for the aggregate services of himself, Shattuck, and Hodgdon measured not by the services of Coolidge to the partnership in dissolution, but

by the services rendered to clients by the firm of Coolidge and Shattuck in Boston and Coolidge and Hodgdon in Chicago, services not rendered in continuing the partnership business, but in winding it up.

"4. Because he rules and finds that Coolidge is entitled for services rendered as liquidating partner (his services to include the aggregate of his own services and those of Shattuck and Hodgdon) to at least eighty per cent of the net commissions from the unfinished work of the partnership."

"10. Because he finds that the good-will of Shepley, Rutan and Coolidge under the rule in *Hutchinson* v. *Nay*, 187 Mass. 262, 266, was of no value."

The suit was reserved by *Pierce, J.*, for determination by the full court upon exceptions by the plaintiff to the master's report and a motion by the defendant that the report be confirmed.

*S. L. Whipple*, (*R. E. Tibbetts* with him,) for the plaintiff.

*T. Hunt*, (*R. L. Mapplebeck* with him,) for the defendant.

CARROLL, J. This bill in equity for a partnership accounting is brought by the executrix of the will of Charles H. Rutan against Charles A. Coolidge, sole surviving and liquidating partner of Shepley, Rutan and Coolidge, architects. Shepley died in 1903, and the business of the firm after his death was carried on by Rutan and Coolidge, each member having fifty per cent of the profits. The firm was dissolved on December 1, 1914. Rutan died on December 17 of that year. The firm had offices in Boston and Chicago. The designing and all the artistic and creative work were done by the defendant. Rutan had charge of making calculations of construction, writing the specifications, superintending construction and office details, in Boston; he had little to do with the Chicago office. He did no designing and had personal relations with only a few of the clients. At the time of the dissolution the majority of the firm's clients looked chiefly to Coolidge, and a substantial number of important clients had stipulated for his personal services. In August, 1912, Rutan became incapacitated and after that time took no part in the business, but continued to receive his full share of the profits.

There were on hand in the office of Shepley, Rutan and Coolidge at the time of the dissolution, jobs in all stages, from work actually in operation to work only vaguely contemplated, where only ten-

tative plans had been discussed with the architects. The principal question in the case is the method to be adopted in stating the account of the so called unfinished business and good will.

The plaintiff contended that each job constituted a contract between the owner and architect, which, although subject to termination by the owner, was an asset of the partnership, which it was the right and duty of the liquidating partner to complete and account for. The master found that there were no such contracts, and ruled that, in absence of special contracts, the only assets of the partnership on December 1, 1914, resulting from uncompleted jobs, at whatever stage, consisted of two items: (1) the fair value of services rendered to date and not paid for; and (2) the contingent value of the job, as one of the many items to be taken into account in determining the value of the good will of the partnership. In determining the assets of the firm, he included the personal property and equipment, cash in hand, receivables due from clients, as well as accounts assumed and completed by the defendant as liquidating partner. In determining the value of that portion of the good will which consisted of the possibility of future business concerning which the firm had not been consulted, the master took into account the personal nature of the relation of architect and client, and the reputation and prominence of the individual members of the firm, and found that as against the defendant's right to compete, this general good will of the firm of Shepley, Rutan and Coolidge was of no substantial value. The evidence is not reported.

That portion of the good will which consisted of the possibility of retaining or securing the right to continue the work in various stages where the firm had already been consulted, was found to be of some substantial value. The plans and sketches belonging to the firm were of little worth apart from the work to which they related. Their value to such work was contingent upon the possessor having the right to carry it on; and in estimating this portion of the good will, the contingent value of these sketches and plans in connection with current work was included. Subsequent to December 1, negotiations between the parties were in progress, and finally the assets of the firm, including the good will, "except its cash on hand and on deposit, bills receivable, books of account, and rights in contracts unfinished December 1,

1914, and in connection with work already at hand at that time, such contracts and work to be completed by Mr. Coolidge, the surviving partner, for the account and risk of the firm," were sold at auction to Coolidge for $13,400. The master found that the consideration was adequate for the assets sold, including the good will.

The defendant assumed responsibility as liquidating partner, to complete and account for all work on which, as between contractor and owner, contracts had been made on December 1, 1914; and in stating the account the defendant was held accountable for the profits on this work. He was allowed his expenses in completing these undertakings, and also compensation for his personal services as architect. Payments were made by the defendant for the work done as liquidating partner to the plaintiff on account of her husband's share, amounting to $78,856.94, and it was found that there was still due the sum of $18,373.56, which was paid in full with interest after the filing of the master's original report, as shown in the supplementary report. The plaintiff filed exceptions to the master's report, but no objections were filed by the defendant and the case is before us on the reservation of a single justice.

In *Hutchinson v. Nay*, 187 Mass. 262, 266, it was decided that if the sale of the good will of a partnership was ordered by the court, such a sale is to be "conducted on the footing that the surviving partner was at liberty to enter on a competing business and to solicit trade from the customers of the old firm." The master followed this rule and found that that portion of the good will of Shepley, Rutan and Coolidge which consisted of the possibility of future business concerning which the firm had not been consulted, was of no value.

In professional partnerships the good will, in so far as it relates to the possibility of future business, may be found to be of only nominal value. A professional partnership depends on the personal qualities of its members and the good will may be of little or no value to the estate of the deceased member. As was said in *Foss* v. *Roby*, 195 Mass. 292, 297: "In a mercantile partnership the sale of good will conveys an interest in a commercial business, the trade of which may be largely, if not wholly, dependent upon locality, and the right which the vendee acquires under such a

purchase is the chance of being able to retain the trade connected with the business where it has been conducted. . . . But in a partnership for the practice of dentistry, the personal qualities of integrity, professional skill and ability attach to and follow the person not the place." *Dwight* v. *Hamilton,* 113 Mass. 175. *Mandeville* v. *Harmon,* 15 Stew. 185, 191, 193. But in our opinion it could not be said of the firm of Shepley, Rutan and Coolidge that as matter of law it had no good will in this possibility of future business; it was a question of fact. The right of the survivor to follow his profession could not be affected by the death of his partner or the voluntary dissolution of the partnership. He had a right to seek the patronage of the clients of the old firm; he had a right to enter upon a competing business. And this fact was important in deciding whether the general good will of the firm was of any substantial value. *Hutchinson* v. *Nay, supra.* The business of Shepley, Rutan and Coolidge was not confined to any one place. It had business in different parts of the country and the defendant for many years had dealt with its clients. He was recognized as the member who did the designing and artistic work. Rutan had personal relations with few of the clients. He did no designing, and for more than two years before he died took no part in the business of the firm. On these facts, together with the evidence that the relation of architect and client is of a peculiarly personal nature, the master was fully justified in finding that this portion of the good will was of only nominal value.

That portion of the good will which consisted in the possibility of obtaining a right to continue the jobs in various stages, as to which the firm had already been consulted, but where contracts between owner and contractor had not been let, was found to be of substantial value; in estimating it the master took into account the plans and drawings which were of no intrinsic value, but were of value, to their owner in connection with the possibility of holding the work, provided he secured it. These plans and drawings and the good will were sold at auction with the other assets already referred to, and it was found that the consideration was adequate. The plaintiff cannot complain of this finding. This portion of the good will could be found to be of some value, and the finding that the consideration paid was fair, cannot be disturbed.

When the firm was dissolved there was work on hand where, between owner and contractor, contracts had been let. This work the defendant undertook to complete and account for, as liquidating partner, as unfinished business of the firm. It was carried to completion and the defendant was charged in the account for the money received. The defendant having undertaken this work as a part of the firm assets, and continued it to completion as a liquidating partner, it became the property of the firm, to be accounted for by him. *Moore* v. *Rawson,* 185 Mass. 264. *Hutchins* v. *Page,* 204 Mass. 284. *Wightman* v. *Wightman,* 223 Mass. 398, 403.

In stating this part of the account Mr. Coolidge was allowed a special compensation for his services. While profits earned in the liquidation of a commercial partnership as a general rule belong to the firm without deduction for the services of the liquidating partner, under the rule in this Commonwealth the right to charge profits with compensation for the liquidating partner depends upon the particular facts of each case. *Robinson* v. *Simmons,* 146 Mass. 167. *Thayer* v. *Badger,* 171 Mass. 279. *Magullion* v. *Magee, ante,* 360, 371. The facts warranted the finding that the liquidating partner was entitled to compensation for the services rendered, and the master states that in allowing him compensation for his services in the Boston office, "I have considered not only their great value, but his very low expense charge." The plaintiff's exceptions to this part of the report cannot be sustained.

The plaintiff contends that all work in the office of the firm on December 1, 1914, no matter in what stage of completion, was unfinished work of the firm and as such was to be accounted for by the liquidating partner. For that part of the work which he assumed as liquidating partner the plaintiff has received the benefit. As to the portion of the work about which the firm had been consulted but where there were no contracts between the owner and contractor, it was taken into account, in the sale of the assets, as a part of the good will. The ruling of the master on this question was sufficiently favorable to the plaintiff.

In *Stem* v. *Warren,* 227 N. Y. 538, upon which the plaintiff relies, two firms of architects, Reed and Stem and Warren and Wetmore, entered into a partnership to perform certain work

awarded them, for a railroad company. In the contract between the firms and in the contract with the railroad, it was provided that the contract should not be ended by death, but the railroad company reserved the right to terminate its contract in the event of Reed's death. He was the executive head of the work, and when he died the firm of Warren and Wetmore induced the railroad company to terminate the contract. It was held, in view of this special contract and the conduct of Warren and Wetmore in inducing the railroad company to terminate the contract, that the firm of Reed and Stem was entitled to share in the profits of the work, notwithstanding the death of Reed. See also *Consaul v. Cummings*, 222 U. S. 262. In the case at bar there was no special contract of this kind, and on this ground it is to be distinguished from *Stem* v. *Warren.*

When the firm was dissolved work was contemplated by the University of Nebraska about which Shepley, Rutan and Coolidge had been consulted, but no contract had been made; the offer of the firm had been accepted only conditionally and the entire plans were largely dependent on the outcome of a referendum vote in November, 1914; and after the election of that year the failure to complete the contract with Shepley, Rutan and Coolidge and the University of Nebraska, was not due to the acts of the defendant or his associates. There was no special contract with the University of Nebraska, nor with any of the firm's clients, at the time of dissolution, similar to the contract in *Stem* v. *Warren,* and that case is not applicable. Other so called unfinished business for which the plaintiff seeks to hold the defendant (aside from contracts between owner and builder actually let on December 1, 1914, which the defendant completed and for which he accounted to the plaintiff) in principle stand on the same footing.

The master was right in finding that there was no bad faith on the part of the defendant. The facts found show that he conducted himself with entire good faith in all the negotiations and there is nothing to indicate that he was unfair or dishonest in any way. During the transition period, December 1, 1914, until the sale at auction of the firm assets on June 23, 1915, the defendant did nothing which tends to support the plaintiff's claim of bad faith. It was found that in adjusting the affairs of the firm during this period, the defendant acted in good faith and that

his method of settling the accounts between the old and the new firm was under all the circumstances "as correct and fair a method as could be used." As to the item of interest on the sum of $20,079.26, with which the plaintiff claims the defendant should be charged from June 1, 1916, to March 7, 1917 — this sum of $20,079.26 was paid by Coolidge and Shattuck to the Shepley, Rutan and Coolidge account, but it was not in fact paid until March 9, 1917. We find no error in refusing the allowance of interest on this sum until it was paid to the firm of Shepley, Rutan and Coolidge, especially in view of the master's finding that the method of adjusting the accounts between the two firms, was fair and accurate under all the circumstances.

Without passing in detail upon the several rulings of the master, it is enough to say that no error was made injuriously affecting the substantial rights of the plaintiff. *Freeman* v. *Robinson,* 238 Mass. 449.

The exceptions are overruled and a decree is to be entered dismissing the bill.

*So ordered.*