## HILL v. COMMISSIONER OF INTERNAL REVENUE.*

### PLUMER v. SAME.

Circuit Court of Appeals, First Circuit.
January 23, 1930.

Nos. 2360, 2361.

Anderson, Circuit Judge, dissenting.

Robert G. Dodge, of Boston, Mass. (H. S. Davis, of Boston, Mass., on the brief), for petitioners.

J. Louis Monarch, Sp. Asst. to Atty. Gen. (Sewall Key, Sp. Asst. to Atty. Gen., and C. M. Charest, Gen. Counsel, and John MacC. Hudson, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for the Commissioner.

Before BINGHAM, ANDERSON, and WILSON, Circuit Judges.

BINGHAM, Circuit Judge. These petitions, No. 2360 and No. 2361, are to review decisions of the Board of Tax Appeals of February 19, 1929, affirming deficiency assessments of income taxes against the respective petitioners for the calendar years 1920 and 1921. The question involved is the same in both cases. The facts as found by the board are in substance:

The petitioners are partners in the firm of Elmer A. Lord & Co., under which name an insurance agency and brokerage business

*Certiorari denied 50 S. Ct. —, 74 L. Ed. —.

has been conducted in Boston since prior to 1912. On May 28, 1912, partnership articles were executed by the petitioners, Plumer and Hill, and Elmer A. Lord and Horace A. Soule. In the articles it was provided that the firm name should be Elmer A. Lord & Co.; that the partnership was "to continue for an indefinite term according to the pleasure of the aforesaid parties, but terminable according to the terms and conditions herein contained"; that the respective interests of the partners at that time were Lord, thirty-seven per cent. (37%), Soule, thirty per cent. (30%), and Hill, fifteen per cent. (15%); that by the instrument it was intended to sell Lord's share to the other partners; that Lord has sold to Soule, Plumer, and Hill "one share, or one per cent. (1%), of the interest in said business" to be held jointly by them and paid for by them monthly "out of the balance of the profits, which said Soule, Plumer, and Hill are jointly entitled to draw from the firm after allowing said Lord five per cent. (5%) interest annually, payable quarterly, on the respective indebtedness"; that Lord has sold to Soule "twenty-one (21) shares, or twenty-one per cent. (21%) of the interest in said business, ten per cent. (10%) of which has been paid for by said Soule in cash" and eleven per cent. (11%) of which is to be paid for by him monthly out of the balance of the profits which Soule is entitled to draw out from the firm after allowing Lord five per cent. (5%) interest annually, payable quarterly, on the respective indebtedness until the total amount of the purchase price is paid; that Lord has sold to Plumer "ten (10) shares, or ten per cent. (10%) of the interest in said business," and to Hill "five (5) shares or five per cent. (5%) of the interest in said business," payment for which was to be made by them monthly "out of the entire balance of the profits which said Plumer and said Hill are entitled to draw out from the firm after allowing said Lord five per cent. (5%) interest annually, payable quarterly, on their respective indebtedness until the total amount of the purchase price is paid."

After making provision as to how "the price for the purchase of the said interest" should be determined, and after stipulating "that in case of voluntary retirement of any member of the firm the remaining members shall have the first opportunity of purchasing the interest of said retiring partner," and fixing the method of determining the price, the articles of agreement provided:

"XIV. And it is further understood and agreed that in the event of the death of any one of the aforesaid partners that the surviving partners will pay to the estate of the deceased partner, provided his interest is fully paid up at the time of his decease, three (3) annual payments for the three (3) entire years next succeeding the time of his death, *sums equal to the full amount of his net profits* for each of said three years, and for the entire fourth and fifth years next succeeding such death sums equal to five per cent. (5%) of the full amount of his net profits for each of the said fourth and fifth years, such payments to be made monthly, provided, however, if the interest of said Soule, Plumer, and Hill have not been fully paid for, that the estate of the said deceased shall receive that proportion which his interest already paid up, including accrued profits, bears to the agreed purchase price named in this instrument, and the completion of these payments shall be in full settlement of the said deceased partner's interest, and the business shall then become the sole property of the surviving partners."

Soule died March 18, 1920, at which time his interest in the partnership was fully paid up. After his death the share in the profits of the business, to which he would have been entitled had he lived, was paid to his estate over a period of years in accordance with the terms of the agreement signed May 28, 1912. The profits of the firm were divided month by month, the same as before his death, and a check was sent to his estate just as if it were a member of the partnership. The share paid to the estate was set up in the books of the firm in the same manner as it had been during the lifetime of Soule and in the same manner as the shares of the partners. The sum of $43,547.81 was distributed to Soule's estate during the year 1920. For the year 1921 there was distributed to his estate the sum of $34,823.24.

June 5, 1920, Plumer, Hill, and one Mason entered into a new partnership agreement under the name of Elmer A. Lord & Co., operative from the 1st day of April, 1920, in which it was recited that Soule, Plumer, and Hill had purchased and paid in full for the entire interest of Lord; that by the death of Soule on March 18, 1920, subsequent to said purchase and payment, the partnership [of May 28, 1912] had been dissolved, and that Plumer and Hill had become entitled (subject to the rights of the estate of said Soule under paragraph XIV above quoted) to fifty-eight and one-third (58⅓) and forty-one and two-thirds (41⅔) shares, respectively of the business and assets of said firm; and it was therein agreed that Plumer,

Hill, and Mason associate themselves as co-partners under the name of Elmer A. Lord & Co., for the purpose of carrying on a general insurance business and that Plumer sell to Mason three (3) shares or three per cent. (3%) interest in the business and Hill sold to Mason two (2) shares or two per cent. (2%) interest, fixing the terms of payment. The sixth and seventh paragraphs of this agreement of June 5, 1920, are as follows:

"6. The payments to which the estate of said Soule is entitled under the provisions of paragraph XIV of the partnership agreement of May 28, 1912, shall continue to be made, that is to say, there shall be paid to said estate for the remainder of the three years next succeeding the death of Soule fifty-one and fifty-one ninety-ninths (51 51/99ths) per cent. of the net profits of the business and for the two years next succeeding said three years one-twentieth of fifty-one and fifty-one ninety-ninths (51 51/99ths) per cent. of said net profits, said payments to be made monthly.

"7. During the remainder of the three years next succeeding the death of Soule, Plumer shall be entitled to twenty-three and twenty-eight ninety-ninths (23 28/99ths) per cent. of the net profits of the business, Hill to twenty and twenty ninety-ninths (20 20/99ths) per cent. (subject to the obligation to apply so much thereof as represents two (2) per cent. of the net profits as provided in paragraph 2 hereof until the payment of his indebtedness to Plumer) and Mason to five (5) per cent. (subject to the obligation to apply it as provided in paragraph 3 hereof until the payment of his indebtedness to Plumer and Hill) and thereafter subject to the payment required to be made to the estate of Soule as aforesaid for the two years next succeeding they shall be entitled (if the options given in paragraph 11 hereof are exercised and subject to the performance of the terms of said options) to forty-five (45) per cent., forty-five (45) per cent. and ten (10) per cent. respectively of said net profits and to corresponding shares of the assets and business of the partnership."

As to the nature and manner of conducting the business the board found that each of the signers of the agreement of May 28, 1912, was a man of large experience in the insurance field and each had built up an individual clientele; that the value of an insurance agency and brokerage business consists largely of the probability that insurance originally written as a result of the efforts of the agency will be renewed from year to year through the same agency; that the net value of the tangible assets of the old partnership was very small in comparison with the value of its good will; and that after his death Soule's clientele was solicited by the new partnership and the business was conducted as intensively and in the same manner as it had been during his lifetime.

In their income tax returns for 1920 and 1921 each of the petitioners omitted the sums paid to Soule's estate in computing the amount of partnership income available for distribution to themselves.

The Commissioner in assessing the deficiency taxes for 1920 and 1921 treated the sums paid to Soule's estate in each of those years the same as though they had been received by the petitioners as income according to their respective shares in the new firm, and then paid out by them in acquiring Soule's interest in the old firm, which they had contributed to the new firm. The Board of Tax Appeals held that the sums paid to Soule's estate each year were not ordinary and necessary expenses of the new partnership deductible from its gross income nor a distribution of partnership profits to one owning an interest therein; nor an ordinary and necessary expense of the petitioners, but the purchase of a capital asset; and these appeals were taken.

The errors assigned are in effect: (1) That the Board erred in holding that what took place on the death of Soule was in substance a purchase of his interest in the business—a capital asset by the petitioners and that, thereafter, the net profits of the business must be treated as distributable to them; and (2) in holding that the sums paid to Soule's estate pursuant to article XIV of the agreement of May 28, 1912, was not deductible as an expense of the partnership.

As we understand it, the contention of the petitioners is that, as under the agreement they entered into with Soule (article XIV of the agreement of May 28, 1912), they, as surviving partners of the old firm, were obligated to pay a portion of the profits of the new firm to Soule's estate, such payments should not be held to be a part of the net income of the new firm distributable to them as income, but a charge on its profits and as such deductible as an ordinary and necessary expense of the new firm in arriving at its net income (sections 218 (d) and 218 (c) of the Revenue Acts of 1918 and 1921 [40 Stat. 1070, 42 Stat. 245]) and the petitioners' distributive shares therein. Section 218 (a) of the Revenue Acts of 1918 and 1921.

■ We do not think this contention can be sustained. To begin with the petitioners were not obligated, under article XIV of the agreement of May 28, 1912, to pay a portion of the profits of the new firm to Soule's estate. By that article they agreed to pay to his estate "sums equal to the full amount of the net profits" which he would have received had he lived and the business had gone on. This did not require that the payments which the petitioners were to make should be made out of the net profits of the new firm's business. Those payments could be made out of any funds which the petitioners chose to make them. The firm was not obligated by article XIV to pay these sums out of its profits or otherwise and it never became obligated to do so. This being so these payments to Soule's estate were not a charge upon the profits of the new firm's business and deductible as an ordinary and necessary expense of its business, if payments charged upon the profits of a business could be regarded as an ordinary and necessary expense within the meaning of section 214 (a) (1) of the Revenue Acts of 1918 and 1921. The mere fact that the petitioners, after having assumed the obligation contained in article XIV, elected to have it discharged out of the undistributed profits of the new firm did not create a charge upon those profits, nor diminish the petitioners' distributive shares therein. Section 218 (a) provides: "There shall be included in computing the net income of each partner his distributive share, whether distributed or not, of the net income of the partnership for the taxable year." If a partner by causing his personal obligation to be satisfied out of the profits of his firm could thus diminish his distributive share, the purpose of the statute would be set at naught. Mitchel v. Bowers (C. C. A.) 15 F.(2d) 287.

■ The estate of Soule was not a partner in the new firm and the payments to it out of the firm's profits were not the receipt of a partner's distributive share in the net income of the firm. The old firm was dissolved by Soule's death and his interest in it passed to the petitioners, subject to the payments they were to make under article XIV. The payments contracted for were to be made by the individual petitioners, not by the new firm, and are in no sense an expense of the firm. And as regards the individual petitioners the payments made to the estate are not deductible as ordinary or necessary expenses for they were made by the petitioners in the purchase of a capital asset.

■ Then again, if it may be said that it was impliedly contemplated that a new partnership composed of the petitioners, and perhaps others, should be organized to carry on the business, as was done; that the assets and good will of the old firm should be turned over to the new partnership; that Soule's estate should agree to discharge the petitioners from their obligation to it; and that the new partnership should agree to pay to Soule's estate a sum equal to Soule's share in the old firm out of the net profits of the business of the new partnership, and this was all done, we do not think the result would be different. It would still be the purchase of a capital asset by the new partnership payable out of the net profits of its business, which profits belonged and would otherwise have been distributed to its members. It was not the payment of an ordinary and necessary expense of the business of the new partnership. The statute does not allow deductions from net income or profits when once fixed. It is then all taxable to the partners in proportion to their shares. Benedict v. Price, 38 F.(2d) 309 (decided November 26, 1929, Eastern Dist. of N. Y.); Newark Milk & Cream Co., Petitioner, v. Com'r of Int. Rev., 34 F.(2d) 854 (C. C. A. 3d Cir.).

In each case: The order of the Board of Tax Appeals is affirmed.

ANDERSON, Circuit Judge (dissenting). In my view, article XIV of the partnership articles of May 28, 1912, effectually prevented the shares of the profits paid to the Soule estate from being beneficially or for taxation purposes a part of the income of the surviving partners. The Tax Board finds that after Soule's death on March 18, 1920, "his share in the profits of the business to which he would have been entitled had he lived was paid to his estate over a period of years in accordance with the terms of the agreement signed May 28, 1912. The profits of the firm were divided month by month the same as before his death and a check was sent to his estate just as if it were a member of the partnership. The share paid to the estate was set up in the books of the firm in the same manner as it had been during the lifetime of Soule and in the same manner as the shares of the partners. The sum of $43,547.81 was distributed to Soule's estate during the year 1920. For the year 1921 there was distributed to his estate the sum of $34,823.24."

The course taken by the survivors and the new partnership—of recognizing the financial and equitable rights of Soule's estate

—was simply the course which any court of equity would have compelled them to follow; if the succeeding concern had failed to make the payments provided for in said article XIV, a court of equity would have made these payments a charge upon the profits of the new partnership. In equity, these profits belonged to the Soule estate. Even if the surviving partners and the new firm took legal title, they took nothing more.

I entirely dissent from the view in the majority opinion that:

"The mere fact that the petitioners, after having assumed the obligation contained in article XIV, elected to have it discharged out of the undistributed profits of the new firm did not create a charge upon those profits, nor diminish the petitioners' distributive shares therein."

The succeeding partnership took the business absolutely subject to the obligation to pay the Soule estate as provided in article XIV. There were no divisible profits for the survivors and the new partnership unless and until they made these payments. Theoretically, they might have paid out of their other asests; but they were bound to pay the amounts provided in article XIV before they could divide beneficially—for their own use—the remainder of the profits of the succeeding partnership. This theoretical right to pay from other sources has no relevancy. Perhaps the fundamental defect in the logic of the majority opinion is the assumption that all the profits of the firm belong to, and must be divided among, the partners. This is not so. Frequently the estate of a deceased partner having a continuing right or interest in the firm is entitled to share in the profits, although not a partner. This was held in the case of Robinson v. Simmons, 146 Mass. 167, 175, et seq., 15 N. E. 558, 4 Am. St. Rep. 299. Section 224 of the Revenue Act of 1918, 40 Stat. 1074, seems to contemplate the same situation. It provides:

"That every partnership shall make a return for each taxable year, stating specifically the items of its gross income and the deductions allowed by this title, and shall include in the return the names and addresses of the *individuals who would be entitled to share in the net income if distributed and the amount of the distributive share of each individual.* The return shall be sworn to by any one of the partners."

See, also, Thompson v. Commissioner (C. C. A.) 28 F. (2d) 247; Rutan v. Coolidge, 241 Mass. 584, 598, 136 N. E. 257. Essentially the same doctrine was applied by the Board of Tax Appeals in Brown v. Commissioner, 10 B. T. A. 1036. Compare, also, Bull v. Commissioner, 7 B. T. A. 993.

I can find nothing in the statute or in the decisions of the Supreme Court holding income taxable unless it belonged to the taxpayer beneficially and was subject to his own spending proclivities. Cf. Eisner v. Macomber, 252 U. S. 189, 203, 206, 207, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570—where the Supreme Court considered elaborately whether a stock dividend is income within the taxable sense. The majority said *no,* because a stock dividend simply diminishes the value of the stockholders' shares. The minority said *yes,* because they held that the surplus profits of a corporation, when put in the form of additional stock, became available to the stockholder in a way sufficiently analogous to a real cash dividend so as to increase his income. But the present point is that both majority and minority dealt with taxable income as a real thing, —something the taxpayer may keep and use for himself and his family—not a myth.

It is at least doubtful whether under the Sixteenth Amendment Congress could tax, as the income of the petitioners, profits in which they never had the slightest beneficial interest. But I am clear that Congress has made no such attempt. Compare Tax Commissioner v. Putnam, 227 Mass. 522, 526, 116 N. E. 904, L. R. A. 1917F, 806; and United States v. Phellis, 257 U. S. 156, 168, 42 S. Ct. 63, 65, 66 L. Ed. 180, where the Supreme Court said:

"We recognize the importance of regarding matters of substance and disregarding forms in applying the provisions of the Sixteenth Amendment and income tax laws enacted thereunder. In a number of cases besides those just cited we have under varying conditions followed the rule. Lynch v. Turrish, 247 U. S. 221, 38 S. Ct. 537, 62 L. Ed. 1087; Southern Pacific Co. v. Lowe, 247 U. S. 330, 38 S. Ct. 540, 62 L. Ed. 1142; Gulf Oil Corporation v. Lewellyn, 248 U. S. 71, 39 S. Ct. 35, 63 L. Ed. 133."

The result reached by the Board of Tax Appeals now affirmed is grossly inequitable; the incomes of the surviving partners are padded by adding the shares of the Soule estate, thus artificially increasing the base on which their income taxes are reckoned, and also, very likely, the rate under the graduated scale. Nor does this result exonerate the

Soule estate from any tax,—inheritance or income,—Federal or State. It amounts to imposing a heavy, additional tax, on the share of profits of the Soule estate in his firm, in large part payable by persons having no beneficial interest in those profits.

But when a partnership is dissolved by death, the surviving partners are quasi-trustees, to account to the estate of the deceased partner for his rights in the firm; if, as an incident of such survivorship and accounting, they pay taxes upon profits accruing under the partnership articles to the estate of the deceased partner, then such payments ought to be allowed them in their account with the Soule estate, and to exonerate, pro tanto, the Soule estate from income tax on the same profits. Under a trust under a written instrument, the trustee who pays the income tax of course pays it out of shares otherwise accruing to his beneficiaries.

However viewed, the results now reached are, in my opinion, unjust, inequitable and illegal. If the case were otherwise doubtful, as I think it is not, it would plainly fall within the doctrine of Gould v. Gould, 245 U. S. 151, 38 S. Ct. 53, 62 L. Ed. 211, where it is laid down:

"In the interpretation of statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the government, in favor of the citizen. United States v. Wigglesworth, 2 Story, 369, Fed. Cas. No. 16,690; American Net & Twine Co. v. Worthington, 141 U. S. 468, 474, 12 S. Ct. 55, 35 L. Ed. 821; Benziger v. United States, 192 U. S. 38, 55, 24 S. Ct. 189, 48 L. Ed. 331." See, also, United States v. Merriam, 263 U. S. 179, 187, 188, 44 S. Ct. 69, 68 L. Ed. 240, 29 A. L. R. 1547.