### POPE v. COMMISSIONER OF INTERNAL REVENUE.
#### No. 2397.

Circuit Court of Appeals, First Circuit.
April 3, 1930.

ANDERSON, Circuit Judge, dissenting.

John N. O'Donohue, of Boston, Mass. (John F. Malley, of Boston, Mass., with him on brief), for petitioner for review.

Randolph Codman Shaw, Sp. Asst. to the Atty. Gen. (G. A. Youngquist, Asst. Atty. Gen., Sewall Key and Barham R. Gary, Sp. Assts. to the Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Joe S. Franklin, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., with him on brief), for the Commissioner of Internal Revenue.

Before BINGHAM, ANDERSON, and WILSON, Circuit Judges.

BINGHAM, Circuit Judge.

This is a petition to review an order of the Board of Tax Appeals pursuant to the Revenue Act of .1926, c. 27, §§ 1001, 1002, 1003 (44 St. L. 9, 109, 110 [26 USCA §§ 1224, 1225, 1226]). The years in question are 1917, 1918, 1919, and 1920. The statutes involved are section 1204(1) (e) of chapter 63 of the Revenue Act of .1917 (40 Stat. 331), and sections 212(a), 214(a) (1), and 218(a) (d), of the Revenue Act of 1918 (40 Stat. 1064, 1066, 1070).

It was found by the Board that a fire insurance business, under the name of Cyrus Brewer & Co., had been conducted for a number of years prior to 1905; that in that year the petitioner's father and Gilmore formed a partnership, to which the former contributed the assets and good will of the old business of Cyrus Brewer & Co. On the father's death, shortly after the formation of the partnership, the petitioner succeeded him, with a right to one-half the profits, and Gilmore, who paid the father's estate $9,000, was to have the other half. On November 30, 1907, William T. Ulman was admitted to the firm. New articles of partnership were executed, in which the petitioner and Gilmore were to have 37½ per cent. each and Ulman 25 per cent. of the. profits.

The new contract contained the following provisions:

"Ninth. In case of the decease of any one of the partners the two surviving partners shall have an option upon the share or interest in the partnership of the deceased partner, and the price to be paid therefor shall be the proportionate share of the deceased partner in the profits of the business for the three years succeeding the date of his decease, or at their option a cash payment equivalent thereto if the same can be determined upon by the survivors and the legal representatives of the deceased. Said option shall be exercised, if at all, within sixty days of said decease.

"Tenth. Upon the decease of one of the partners, in case said option shall not be so exercised or the termination of the partnership from any other cause, a true and perfect account of all matters connected with said partnership shall be made, and the expenses, losses, profits and partnership assets shall be divided between the partners

in the same proportions as at that time shall govern the division of any profits."

April 1, 1910, one Bullard was admitted as a special partner. He contributed the assets and good will of A. M. Bullard & Co., an insurance business, and was to have $6,-600 per annum so long as the assets contributed by him remained in the business, and it was provided that this sum should be paid to him before the general partners shared in the profits of the business. The partnership of November 30, 1907, was ratified and confirmed, modified only as made necessary by the admission of the new partner and the agreements covering the same, which, in case of Bullard's decease, made the option given by article 9 of the agreement of November 30, 1907, applicable to the purchase of his share or interest in the partnership.

In December, 1916, Gilmore and Ulman died, and on February 10, 1917, a new partnership was formed, as of January 1, 1917, by the petitioner, Bullard, Snow, Hallahan, and Perkins, under the name of Cyrus Brewer & Co. It was to continue for three years from January 1, 1917, unless extended for a further period by written agreement made prior to November 1, 1919.

All the rights and interests of Bullard and his estate, as set forth in the agreement of April 1, 1910, were adopted, and all liabilities to him and his estate were assumed by the new firm.

The rights and interests of the estates of Gilmore and Ulman because of their membership in the partnership of November 30, 1907, as modified by the agreement with Bullard, were "set forth in article 9, and the liabilities to them were assumed by the new firm as therein set out."

Article 9:

"The interests and proportions of each of the new partners, Snow, Hallahan and Perkins in the profits are as follows:

"After the payment of all obligations hereunder to said Bullard, said Snow shall receive in each of the years 1917, 1918 and 1919, 13.26% of the profits of the firm, said Hallahan shall receive 12.13% of said profits, and said Perkins shall receive 6.61% of said profits. The balance of said profits, 68%, shall be divided equally between said Pope, the estate of said Gilmore, and the estate of said Ulman. The estates are in nowise parties hereto and are hereby expressly held harmless from any liability hereunder."

The tenth and eleventh articles contained provisions, as to continuing the business, in the event of the death of any partner or partners, including Bullard, the disposition of their interests in the firm, and the shares in the profits which the estates of deceased general partners were to have for three years thereafter, "after deducting any amount due said Bullard or his estate."

Article 12:

"If this partnership is terminated at the close of 1919 then to each living partner shall belong the following after distribution of 1919 profits and any share of working capital which he may have contributed:

"To Pope: the name and good will of Cyrus Brewer & Company, the lease, physical property and records, together with all liabilities to A. M. Bullard and any deceased partner.

"To Snow, Hallahan and/or Perkins (severally) the ownership of the brokerage accounts on which each received a commission on the 1916 books."

On the same date the executors of the estates of the two deceased partners signed the following memorandum:

"We have examined the new partnership papers of Cyrus Brewer & Company entered into February 10 between Messrs. Bullard, Pope, Snow, Hallahan and Perkins, and accept the percentages to be paid the estates of Arthur B. Gilmore and William T. Ulman as set forth in Article 9 as correct and satisfactory."

The partnership formed February 10, 1917, continued through the period therein provided for, and on October 31, 1919, was extended for a further period of three years from January 1, 1920, with the same persons as partners.

This partnership of February 10, 1917, paid to the estates of Gilmore and Ulman the sums which those partners had contributed to the capital of the prior partnership, and, during the years 1917, 1918, and 1919, paid to each estate sums equal to 22⅔ per cent. of the profits of the February 10, 1917, partnership; and in 1920 paid to each of them 22⅔ per cent. of that portion of the profits received in that year, which consisted of commissions on insurance written in 1919.

The Board ruled and found that "the partnership agreements under review [of Nov. 30, 1907, modified and affirmed April 1, 1910, and of Feb. 10, 1917] and the sep-

arate agreement of the estates of Gilmore and Ulman, constituted a sale of the interests of the two estates to the new partnership"; that the sums paid to the estates of Gilmore and Ulman out of the profits of the new partnership for each of the years 1917, 1918, 1919, and 1920, were not ordinary and necessary expenses of that partnership paid and incurred during the taxable years in carrying on a trade or business; and, not being deductible expenses, could not be excluded in determining the net income of the partnership available for distribution; that the profits of the partnership belonged to the partners who could not avoid an income tax by causing the whole or a portion of their shares in the profits to be used in acquiring the interest of a deceased partner in the assets of a prior partnership.

The Board reversed the Commissioner, who had apportioned all the profits of the business, after deducting the $6,600 going to Bullard, among the general partners according to their interests, and assigned and taxed all such profits, or 68 per cent., to Pope, the petitioner. This ruling was made on the ground that the agreement of February 10, 1917, indicated that the business, up to December 31, 1919, was principally that of Pope, as that agreement provided that the major part of the business—the name and good will of Cyrus Brewer & Co., the lease, physical property, and records—were to go to him, if the partnership was terminated at the close of 1919.

Two questions are presented by the assignments of error: (1) Whether the sums paid out of the profits of the 1917 partnership to the estates of the two deceased partners constituted taxable income to the general partners of that firm; and (2) if they did, whether they should be apportioned among the general partners, according to their interests in the profits.

Considering the questions in reverse order, we think the Commissioner reached the proper conclusion as to the second question, and that the Board erred in holding otherwise. In passing upon this question, the Board overlooked the fact that article 12 of the partnership agreement of 1917 (the provision on which it based its conclusion) makes the division of the firm property, at the end of 1919, conditional upon the partnership being "terminated at the close of 1919"; and failed to observe that the partnership did not in fact terminate at the close of 1919, but was, by an agreement made prior to that time (October 31, 1919), continued for a further period of three years, in which agreement it was stipulated that, when terminated, "the existing or surviving partners shall divide the proceeds of the assets in the proportion of their several interests in the profits," so that article 12 of the agreement of 1917 never became operative. Then, again, this conclusion of the Board would seem to be inconsistent with its previous ruling and finding that the transactions and agreements between "the new partnership and the executors of the estates of Gilmore and Ulman constituted a sale of the interests of the two estates to the *new partnership*," not to Pope.

Now as to the first question: The answer to that, as we view it, depends largely on whether the Board was warranted in ruling and finding that the above-described contracts taken in connection with the acts of the parties "constituted a sale of the interests of the two estates to the new partnership." This involves a mixed question of law and fact, and depends largely on what the parties intended. If the executors intended to part with the interests of their estates in the good will of the old firm, and the new firm (1917) intended to acquire the same, the question is whether the agreements of 1907, 1910, the two agreements of 1917, and the acts of the parties constitute sufficient evidence from which such a deduction could reasonably be made. In 1907, when article 9 was formulated, there were three partners. For several years, from and after April, 1910, there were four partners. In December, 1916, Gilmore and Ulman having died, there were two surviving partners; and, had Gilmore alone died, there would have been three. This all shows that, after Bullard's admission to the firm in April, 1910, the exact wording of article 9 of the 1907 contract was inapplicable, and from necessity was regarded as modified to meet the new situation, so that the option then given could be exercised by the surviving partner or partners, and whether one, two, or three of the partners had died. In other words, the situation having been changed by the admission of the new partner to the firm, article 9 was impliedly, if not expressly, modified to meet that situation. The surviving partners unquestionably had an option upon the right of each estate in the good will of the old firm, which they could exercise by causing each estate to be paid a certain proportion of the profits of a new partnership to be organized to carry on the business, and in which the survivors alone or with others should be partners. It was not expressly

provided, and none of this class of contracts expressly provide, that the survivors shall form a new partnership, and that they alone shall constitute its membership, but article 9 necessarily contemplates that a new partnership shall be formed, and reasonably leaves it to the discretion of the surviving partners to determine whether they alone or with others will make up the new firm. This conclusion is aided by the fact that the business of insurance brokerage is such that its success depends in a large measure upon the personal solicitation of business by its members; and, when one or two members have died, it often becomes necessary that the number be increased to enable the new firm to hold successfully the old business and acquire new; and is beneficial to the estates of the deceased partners as well as to the survivors. It is also to be noted that the percentage of profits provided in article 9 of the contract 1907 was for Gilmore 37½ per cent. and Ulman 25 per cent., while the percentages fixed in the contract of 1917 were for the estates of Gilmore and Ulman 22⅔ per cent. each. This is why the executors were called upon to accept the new percentages provided for in the contract of February 10, 1917, which they did as heretofore noted.

The contention of the petitioner that the option given by article 9 of the 1907 contract was incapable of exercise by the surviving partners we regard as without foundation, and are of the opinion that the Board was warranted in ruling and finding that a sale was effected of the interests of the two estates to the new partnership.

The purchase was of a capital asset by the new firm, and, being paid for out of its net profits, was not a deductible expense. We can add nothing upon this subject to what was said in our opinion in Hill v. Commissioner, 38 F.(2d) 165, decided January 23, 1930.

The order of the Board of Tax Appeals is vacated so far as it assigned 68 per cent. of the profits to Pope; otherwise it is affirmed, and the case is remanded to that Board for further proceedings not inconsistent with this opinion.

ANDERSON, Circuit Judge (dissenting).

My dissent in Hill v. Commissioner, 38 F.(2d) 165, covers the substance of my views in this case. The fatal fallacy of my associates and of the majority of the Board of Tax Appeals in both cases is that all "the profits of a partnership belong to the partners." This ignores the well-settled doctrine that in a partnership there may be profit sharers that are not partners. Robinson v. Simmons, 146 Mass. 167, 175, 15 N. E. 558, 4 Am. St. Rep. 299; Rutan v. Coolidge, 241 Mass. 584, 598, 136 N. E. 257; London Assur. Corp. v. Drennen, 116 U. S. 461, 472, 6 S. Ct. 442, 29 L. Ed. 688. Compare Thompson v. Commissioner (C. C. A.) 28 F.(2d) 247; Brown v. Commissioner, 10 B. T. A. 1036.

Neither Pope (the only surviving *general* partner), nor the new partnership with three new members, purchased a capital asset from profits belonging beneficially and in a taxable sense to them or any of them. The rights of the estates of the deceased partners in 22⅔ per cent. of the profits of the succeeding partnership were enforceable in equity as a charge on the profits in specie. They belonged to no living person whatever.

Assuming the general, underlying theory, adopted by my associates and by a bare majority of the Board of Tax Appeals (that the surviving partner took all of the profits), Pope alone was taxable for the entire sum of $100,278.52 paid the estates of Gilmore and Ulman for the four years, 1917–1920, inclusive. The majority of the Board of Tax Appeals are logical in this application of their erroneous theory. I can see no reason whatever for loading down the three new partners with parts of the taxes on the shares of profits of their dead predecessors —as my associates do.

But there is a curious failure of the majority of the Board of Tax Appeals to apply consistently the real test of taxability —beneficial interest—in the holding that the petitioner is taxable only for the portions of his profits not paid to his mother or brother, because he took his membership in trust from his father, Arthur W. Pope. Here is a sound recognition that a taxpayer is taxable only on what he has a right to keep for his own use.

Without more, I agree with the able dissent of Mr. Trussell, concurred in by Mr. Siefkin. Compare United States v. Robbins, 269 U. S. 315, 46 S. Ct. 148, 70 L. Ed. 285; O'Malley-Keyes v. Eaton (D. C.) 24 F.(2d) 436; and Young v. Gnichtel (D. C.) 28 F.(2d) 789.