CAROL F. HALL AND ISABEL M. HALL, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket 29345.    Promulgated December 11, 1952.

*George E. Cleary, Esq.,* and *George Stinson, Esq.,* for the petitioners.
*Paul M. Stewart, Jr., Esq.,* for the respondent.

450

452

OPINION.

TIETJENS, *Judge:* The partnership of Touche, Niven & Company paid certain amounts during its fiscal year ended September 30, 1947, to Whitworth, Clowes, and the estate of Victor E. Stempf. The sole issue is whether $48,668.26 of these amounts was paid as part of the purchase price of the interests of these former partners, or as a distribution of profits, as income, to the retired partners and the estate.

If the payments in controversy were paid as part of the purchase price of the interests of the former partners, they would not be deductible in computing the distributable income of the partnership taxable to the continuing partners, of whom Carol F. Hall is one, and, accordingly, in the hands of the retired partners, Whitworth and Clowes, the payments would be properly treated as capital gains. This is the position taken by the respondent in this proceeding, and by the retired partners in their related proceedings. On the other hand, if the payments represented distributions of firm income to the retired partners and the estate of the deceased partner, they would not be includible in the profits taxable to the continuing partners and would be taxable as ordinary income to the retired partners. This is the position of these petitioners and is also the position taken by respondent in the related cases of Whitworth and Clowes.

The payments in controversy were part of a total of $288,433.26 which the administrative partners had agreed to pay Whitworth, Clowes, and the estate of Stempf under the partnership agreement of 1936, which was in effect at the times Whitworth and Clowes retired and Stempf died. This agreement provided that the death or retirement of a partner should not dissolve the partnership between the

remaining partners and required the continuing partners to make certain payments to the retired partners or estates of deceased partners. The continuing partners were required by Article XI, section 1, to repay any loan made the firm by the former partner, as well as his current account balance and his share of the past distributable profits. His paid-up participation in the stated capital was to be repaid in installments with interest. Article XI, section 2, provided that in case of the death of a partner, or his retirement at age 65 there was to be paid, in addition, an amount to be fixed by the administrative partners, which amount was to be measured by the former partner's share in earnings in past years or the share he would have had in the next 3 years' profits had he continued as a partner; it was to be paid out of distributable profits in installments over a period of 6 years; and the agreement stated the payment "is intended as a distribution of income to the retiring partner or the estate of a deceased partner for a limited period subsequent to his retirement or death." In section 3 of Article XI, authority was given the administrative partners to pay such sum as they might deem advisable in the case of any partner retiring before reaching age 65, or withdrawing for any other reason.

The solution of the question depends upon the intent of the parties and that is to be derived from the 1936 partnership agreement. Despite contrary arguments, we think the payments here involved were made pursuant to section 2 of Article XI of that agreement and, accordingly, are controlled by that section. Whitworth argues that section 2 applies only in cases of death or retirement at age 65 and therefore cannot be applicable in his case, since he retired at age 59, but his correspondence with the firm effecting the agreement under which the payments were made to him contradicts this assertion. He wrote the firm giving notice of his intention to retire on September 30, 1943, stating that he agreed that his retirement

shall be effective as of that date, with the understanding that * * * *the provisions of Section 2 of Article XI* shall be applicable to my retirement, [Emphasis added.]

The firm's letter of November 27, 1942, to Whitworth stated

you shall be entitled to receive the retirement payments provided for *in Section 2 of Article XI* of the Partnership Agreement [Emphasis added.]

Clowes also argues that the payments made to him were not pursuant to section 2 of Article XI. His point is that since the administrative partners agreed to compute his payments upon the basis of the past earnings without applying the alternative limitation of the earnings of the subsequent 3 years, the arrangement was not made under section 2, but was made under section 3, giving the administrative partners general authority to make discretionary payments in the case of other retirements. The letters effecting the agreement with

Clowes do no bear out his contention. He claimed the right "to have my additional retirement payments under Section 2 of Article XI determined" without reference to alternative (b), the limitation based on subsequent earnings. The administrative partners decided "that they would waive the terms of subdivision (b)," of section 2. The context of the correspondence clearly shows the intention of the administrative partners and of these retiring partners, that their retirement payments should be fixed pursuant to section 2, as modified in certain particulars at their own requests. The payments to the Stempf estate were also measured by the prior earnings alone without limitation by reference to subsequent earnings. These payments were likewise made pursuant to section 2, rather than section 3.

The payments, being made pursuant to section 2, are subject to certain other provisions of that section. They were to be made "out of distributable profits" and they were "intended as a distribution of income to the retiring partner or the estate of a deceased partner for a limited period subsequent to his retirement or death." Also, it was provided that no annual installment in the first 3 years should be less than 50 per cent of the partner's annual salary at death or retirement or less than $5,000, "unless the distributable profits shall not be sufficient." Thus the payments were keyed to the existence of profits, and the intent appears that a partner who retired, or the estate of a partner who died, was to continue for a time to participate in the profits on the same basis and in approximately 50 per cent of the amount as before the event. We find no language in the written agreement which would justify a conclusion that the retiring partners intended to "sell" their interest in the partnership to the continuing partners, or vice versa, that the continuing partners intended to "buy" the retiring partners' interests.

The case of *Charles F. Coates*, 7 T. C. 125, is here apposite. There are factual differences, but we do not think them significant. Respondent has acquiesced in that case, 1946-2 C. B. 2. Coates was a continuing partner in an accounting firm which provided in the partnership contract that the death of a partner should not operate to dissolve the co-partnership, that the estate should continue as a member for 5 years with no direct voice in management, that the estate should participate in the net earnings in stated proportions and not be liable for losses, that the deceased partner's "capital interest" should be settled as soon as possible, and that at the end of 5 years and the completion of the payments the interest of the deceased parties should terminate. No partner had contributed any capital and capital was not important in that personal service organization. The "capital interest" consisted of (1) the pool of undrawn earnings (the amount withdrawn having been limited to 85 per cent of each partner's share

for the previous year) and (2) the value of the work then in process. We noted that since the agreement provided for the return of any remaining interest in the firm's assets it was difficult to find evidence of an intent to sell the interest of the deceased partner, that the parties placed no value upon the good will and partnership name and that ordinarily no substantial value attaches to good will of such a personal service partnership. We said further:

In addition to the provisions for the return of the "capital interests" to the estates are the provisions with which we are here concerned for participation by the estate of a deceased partner in the earnings of the partnership for five years after the partner's death. These payments have no relation to the other type of payments provided for the liquidation of the capital account. They provide simply that the estate of any deceased partner shall participate to the extent there provided in the net earnings of the partnership for a period of five years. The evidence establishes that this provision was intended by the parties not to be the consideration paid by the surviving partners for the capital interest of a deceased partner upon the dissolution and liquidation of the partnership, but was intended to be a present consideration given by each partner upon the formation of the partnership. It was intended to be in the nature of a mutual insurance plan, the disadvantage of which each partner was willing to accept in consideration of a similar commitment for his benefit on the part of all other partners, and, in part, as further compensation for the past services of the deceased partner payable after his death.

These payments were not made in liquidation of any capital interest of the deceased partner in the firm's assets. The only payments of this nature required upon the death of a partner were the payments on account of past earnings and work in process, here designated as the "capital account." In addition to these payments, the estate of a deceased partner was entitled to the payment of a share of post death earnings, not in consideration of a sale of partnership assets on liquidation, but in consideration of mutual promises contained in the original partnership agreement having no relationship to such a sale. These payments arose out of and depended upon the contract and their character must be determined by its terms. The estate acquired, upon the death of the partner, a vested contractual right to a share of the earnings, as earnings, and this right was fortified by a power lodged in the trustee to require a liquidation of the business if its rights were not fully respected by the surviving partners. When and as the income was earned, it became immediately subject to the preexisting rights of the estates to their share of it. The amounts so distributable to the estates were not distributable to any surviving partner, with the result that here, as in *Richard P. Hallowell, 2nd, supra*, the disputed amount attributed by the respondent to each surviving partner may not be regarded as "his distributive share, whether distributed or not, of the net income of the partnership."

The case of *Richard P. Hallowell, 2nd*, 39 B. T. A. 50, referred to in the above quotation, is also in point. There, the agreement provided that the interest of the estate of a deceased partner should be deemed a loan and that the estate should have the same interest in profits the deceased partner would have had if living, until the termination of a period agreed upon. Since settlement of the capital in-

terest was to be accomplished under other provisions of the agreement, we concluded that the estate shared in profits as a matter of right under the contract. See also *Sidney Hess*, 12 T. C. 773, and cf. *Estate of Boyd C. Taylor*, 17 T. C. 627.

Clowes and Whitworth, and respondent in this proceeding, rely upon certain cases to the effect that where the partners agree that a deceased partner's interest shall be acquired by the surviving partners by payments of firm profits to his estate, there is a sale of the interest and the profits so paid are taxable to the survivors and represent the purchase price of a capital asset. See *Hill* v. *Commissioner* (C. A. 1, 1930), 38 F. 2d 165, affirming 14 B. T. A. 572; *Pope* v. *Commissioner* (C. A. 1, 1930), 39 F. 2d 420, affirming 14 B. T. A. 584; *W. Frank Carter*, 36 B. T. A. 60 (1937), and *Estate of Bavier C. Miller*, 38 B. T. A. 487 (1938). In these cited cases the deceased partners had made a capital investment in the partnership which was not repaid to their estates, but was transferred to the surviving partners in consideration of the payments involved. In the present case the capital investments of the deceased or retiring partners were returned to them in full pursuant to section 1 (c) of Article XI. Payment of the distributable profits for the current year of retirement or death was also provided for in section 1 (b) of Article XI. The payments provided for in section 2 or 3 of that Article were additional and distinct. Since they could not be a return of capital they could be only distributions of income. We think these cases are distinguishable on their facts. No sale or purchase of partnership interests was here intended. See *Bull* v. *United States*, 295 U. S. 247 (1935).

Clowes and Whitworth contend that the partnership had good will of a considerable value and working papers which were an asset in their business, that the interest of the retiring partners in these items was the subject of a sale in the transfer of their interests to the continuing partners and that the payments in controversy were intended as the purchase price of these assets. This argument is not borne out by the agreement. Article IV provides that a deceased, retiring, or withdrawing partner shall have no interest in the firm name and no right to receive any payment therefor. As to the good will, in the first place it is inextricably associated with the firm name and not transferable otherwise, and in the second place the good will of a personal service organization such as this, is rarely a vendible article. *Charles F. Coates, supra.* As for any good will attaching to Whitworth or Clowes individually and separate from firm good will, these retiring partners made no agreement not to compete with the firm and hence must be deemed not to have relinquished or transferred it, if indeed it could be transferable. The firm in its financial calculations at no time placed any value upon the firm name, good will, or working

papers. Nor do we find anything in the agreement disclosing any intention to value good will as such or to make any payments in consideration of the sale thereof to the surviving partners.

We think that the partners in entering into the 1936 agreement, intended that a retired partner, or the estate of a deceased partner, should share in the profits of the firm, as profits, for a limited period after the event, that the provision was in the nature of a mutual insurance plan in which each partner assumed its possible burdens in consideration of the assumption of a like obligation by his partners to him, and that the payments here in controversy were properly deducted by the continuing partners in determining the distributable partnership income taxable to them.

Because of conceded adjustments,

*Decision will be entered under Rule 50.*